**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Leonard LEVY, Robert L. Boynton, and Richard D. Fritz, Defendants.**

Civ. A. No. 88–0131 (RCL).

United States District Court, District of Columbia.

Feb. 2, 1989.

Erich T. Schwartz (argued), Office of Gen. Counsel, S.E.C., Washington, D.C. (Richard J. Sheehan, with him on the brief), for S.E.C.

Leonard Levy, pro se.

## MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

Plaintiff Securities and Exchange Commission in this case seeks permanent injunctive relief against defendant Leonard Levy[1] for his alleged violations of section 13(d)(1) of the Securities Exchange Act of 1934 (hereinafter the "Exchange Act") and Rules 3d–1 and 13d–2 promulgated pursuant to that section, of section 13(d)(3) of the Exchange Act and Rule 13d–5(b)(1) promulgated thereunder, as well as section 10(b) of the Exchange Act and Rule 10b–5 thereunder. In its motion for summary judgment, the plaintiff Securities and Exchange Commission (hereinafter "SEC") requests summary judgment in its favor as to all of these alleged violations of the Exchange Act. Moreover, plaintiff seeks sanctions against defendant pursuant to Rule 37 of the Federal Rules of Civil Procedure for defendant's alleged failure to make himself available for a properly noticed deposition, and for defendant's alleged failure to comply with an order of this court granting plaintiff's motion to compel defendant to produce certain documents. Defendant has opposed plaintiff's motions for summary judgment and for sanctions. Moreover, defendant has moved to extend the time period for discovery,[2] to compel the plaintiff to produce certain documents requested in his document request, to dismiss the plaintiff's complaint, and for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. A hearing was held on all outstanding motions on January 11, 1989 at which the court heard the arguments by counsel for the plaintiff as well as by defendant *pro se*.[3] The court at the hearing took under submission the motions addressed in this memorandum opinion and order. After setting out the material facts about which there is no genuine dispute between the parties, the court shall address the discovery-related motions submitted by both parties before addressing plaintiff's motion for summary judgment.

## I. FACTS

Summary Judgment is appropriate only if "there is no genuine issue as to any

---

1. Robert Boynton and Richard Fritz, defendants in this action, settled with the SEC by consenting to permanent injunctions against future violations of the securities laws.

2. In its order of October 7, 1988, the court ordered that all discovery, including responses, be completed on or before October 31, 1988.

3. The court in its order of December 1, 1988 permitted defendant's counsel to withdraw their appearance in this case.

material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Accordingly, for the purposes of plaintiff's motion for summary judgment, the defendant "enjoys the benefit of all favorable inferences from the evidence proffered ... and the facts offered by the [defendant] if adequately buttressed by evidentiary material, are to be taken as true." *Abraham v. Graphics Arts International Union*, 660 F.2d 811, 814 (D.C.Cir.1981). Moreover, pursuant to local rule 108(h), the court shall "assume that all facts identified by the [plaintiff] in its statement of material facts are admitted [by defendant], unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [4] Rule 108(h), *Rules of the United States District Court for the District of Columbia.*

This case grows out of defendant's initially successful but ultimately tragic attempt to wrest control of Information Displays, Inc. (hereinafter "IDI"), a Delaware corporation whose principal place of business is Armonk, New York. Before its demise in May of 1984, IDI manufactured, marketed, and serviced computer-based interactive graphics systems. IDI's common stock is registered with the SEC pursuant to section 12(g) of the Exchange Act. At times relevant to the issues addressed in this memorandum opinion, its common stock was traded over-the-counter and was listed on the National Association of Securities Dealers Automated Quotation System. Defendant began to make substantial purchases of IDI stock in October of 1983, and by March of 1984 defendant had acquired a controlling interest in IDI. All of plaintiff's claims against defendant relate to defendant's purchases of IDI stock;

more specifically, they relate directly to alleged inaccuracies in the schedules defendant was required to file with the SEC pursuant to section 13(d) of the Exchange Act.

Defendant's purchases of IDI stock were financed largely through a series of loans granted him by the National Bank of Carmel (hereinafter "NBC").[5] NBC was organized as a national banking association in 1980, and became a subsidiary of the Carmel Bancorporation (hereinafter "CBC") on August 8, 1983 when CBC acquired NBC by issuing stock previously registered with the SEC in exchange for 100% of the outstanding shares of NBC. CBC registered and sold a secondary offering of common stock in the first quarter of 1984. Defendant's relationship with NBC was primarily through two of its officers, who are also defendants in this matter: Robert Boynton and Richard Fritz. Boynton was president, chief executive officer and a director of CBC, and executive vice president, cashier, and director of NBC. Fritz was vice president and secretary of CBC, and senior vice president and loan administrator for NBC.

Defendant's business relationship with NBC began when defendant completed an application for a $500,000 line-of-credit from NBC in the name of Jarnel Financial Services, Ltd., an entity owned by defendant and his wife; NBC's loan committee approved this initial $500,000 line-of-credit on October 5, 1983. Defendant applied for this first loan in connection with his participation in the financing of a real estate development project, not expressly in connection with his purchases of IDI stock, although he had also begun purchasing IDI shares in October of 1983. In November

---

**4.** Plaintiff did not comply with this rule since he failed to provide the court with "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated." However, since defendant opposed plaintiff's motion for summary judgment *pro se,* the court excused defendant's failure to comply with this rule and ordered the Clerk of the Court to file defendant's opposition to plaintiff's motion for summary judgment on January 11, 1989. The court accordingly takes defendant's opposition brief as his statement of material

facts as to which it is contended there exists a genuine issue necessary to be litigated, and pursuant to Rule 108(h) it shall assume that all facts identified by plaintiff in its statement of material facts which are not addressed by defendant in his opposition brief are admitted by defendant.

**5.** The purchases were also partially financed by personal funds and by margin loans taken out with the brokerage firms through which defendant was purchasing IDI stock.

or December of 1983, defendant first discussed with Boynton and Fritz the possibility of borrowing money from NBC for the purpose of purchasing IDI stock. In January of 1984, Boynton and/or Fritz agreed to advance defendant additional funds in connection with his purchases of IDI stock. There was never any agreement to lend defendant a specific amount of money in total, and the loans were made piecemeal through the issuance of a series of short-term notes; total disbursements to defendant ultimately exceeded $8 million. Defendant used most of this $8 million,[6] traditional margin loans taken out with the stock brokerage firms through which he was purchasing IDI stock, as well as a proportionately small amount (about $100,000) of personal funds to finance his purchases of IDI stock. Aware that he would have to file a schedule pursuant to section 13(d) of the Exchange Act once he had acquired 5% of the outstanding shares of IDI, defendant hired Sam Frabizzio, a Delaware attorney, to assist him in preparing the required Schedule 13D. Defendant accordingly filed his first Schedule 13D on January 31, 1984. In this first schedule, in relevant part he reported that the source of his funds used for purchasing IDI stock was "personal funds," and he did not report that he had any contracts, arrangements, or understandings with any other person within the meaning of section 13(d)(1)(E) of the Exchange Act, or that he was a member of a "group" sharing a common objective with respect to the purchase of IDI stock within the meaning of sections 13(d)(3) of the Exchange Act. Subsequent to the filing of his first schedule 13(d), defendant retained the firm of Holtzmann Wise & Shepard (hereinafter "HWS") to represent him in his purchases of IDI stock. The parties dispute whether defendant's principal attorneys at HWS—Arthur Malman and Jay Diamond—informed defendant that he was required to report his substantial borrowings from NBC as one source of the funds used to purchase IDI stock. Making all reasonable inferences in defendant's favor, we assume for the purposes of deciding plaintiff's

summary judgment motion that defendant's attorneys misinformed defendant about his obligation to disclose NBC borrowings. On February 21, 1984, defendant filed his first amendment to his Schedule 13D. In that amendment, defendant reported his "source of funds" as a combination of personal funds and margin borrowing. Defendant also did not state that he had any contracts, arrangements, or understandings with any other person or that he was a member of a "group" within the meaning of sections 13(d)(3) of the Exchange Act. Between February 21 and April 20, 1984, defendant filed ten further amendments to his Schedule 13D to reflect additional purchases of IDI stock, and in none of these additional amendments did defendant reveal that he had purchased IDI stock using borrowed money supplied by NBC. Defendant, furthermore, did not state that he had any contracts, arrangements, or understandings or that he was a member of a "group". On May 25, 1984, defendant filed a twelfth amendment to his Schedule 13D in which he reported in relevant part that "[t]he personal funds of Leonard Levy ... referred to [in the previous schedule 13D and amendments thereto] as having been employed to purchase the Issuer's shares, was to a very substantial degree raised by means of a number of advances extended by the National Bank of Carmel ... in the aggregate amount, according to the bank, of approximately $8.5 million (a portion of this amount was used for other purposes)." Defendant did not state in this twelfth amendment that he had any contracts, arrangements, or understandings or that he was a member of a "group."

As early as November of 1983 Boynton and Fritz stated that they were interested in purchasing shares of IDI on behalf of the bank. Defendant accordingly introduced them to two account executives at Bateman Eichler and L.F. Rothschild through which defendant had been purchasing shares of IDI. Defendant had also discussed with Boynton and Fritz, prior to their purchasing shares on behalf of CBC, his plans with respect to IDI, including the

---

6. Most, but not all of the $8 million was used to purchase IDI stock.

possibilities of a tender offer or proxy fight. Between January 13 and 20, Boynton purchased 72,500 shares of IDI in CBC's name.[7]

In early January of 1984, defendant contacted William Weksel, the president of IDI to request a meeting; the two men agreed to meet on January 27, 1984. Boynton, who had by then purchased IDI stock in CBC's name, joined defendant when he flew to New York to meet with Weksel. After arriving in New York, defendant and Boynton met with Mike Levy, a consultant previously employed by Oppenheimer & Co. Mr. Levy placed a call to a friend of his, a Mr. LeBow. Levy, Boynton, and Lebow subsequently carried on a conference call in which they discussed IDI's prospects. Levy and Boynton met the next morning with Weksel. Levy introduced Boynton as "one of the investors in IDI that Levy was bringing along." During that meeting, Levy informed Weksel that other investors were participating with him in his efforts with regard to IDI and that he and his associates held about 400,000 shares in aggregate, including 72,500 shares defendant claimed were held by Boynton. Such other investors, according to defendant, included Boynton, defendant's spouse, and other "friends." After a tour of IDI, Defendant, Boynton, and Weksel were joined by Albert Bromberg, IDI's executive vice president. During a meeting that lasted over one hour, defendant criticized IDI's marketing strategy and management, discussed the possibility of Weksel's resignation, and requested representation on IDI's Board of Directors. Defendant threatened a proxy contest if Weksel did not satisfy his requests within one week. Defendant and Boynton discussed IDI still further after their meeting with Weksel and Bromberg, and then met with Paul Zofnass and George Elling of Oppenheimer & Co. and discussed IDI further. Zofness suggested that he mediate between defendant and

Weksel. Weksel did not ever comply with defendant's demands.

Every one or two weeks during the month of February, 1984 defendant telephoned Boynton and Fritz to ask for more money to purchase IDI stock, which requests were always granted. The bank had made no formal commitment to continue to loan defendant money in support of his purchases of IDI stock, or even to loan him any fixed sum of money with regard to his IDI purchases.

Sometime after the meeting of January 27, 1984, defendant considered three options: to continue purchasing shares on the open market, undertake a proxy fight, or undertake a tender offer. In late February or early March, defendant and Boynton spoke over the telephone. During this conversation, defendant said to Boynton that "we'd have to make a decision on precisely what we were going to do" with respect to IDI.[8] On about March 8, 1984 defendant held a series of meetings over a period of two or three days in New York with Boynton, Fritz, his HWS attorneys and others, including members of investment banking firms, during which these strategy options were discussed and it was decided that defendant should continue to make open market purchases. Defendant soon thereafter asked Boynton and Fritz if they would serve on IDI's Board of Directors, and they agreed. Finally, on March 23, 1984, defendant entered into an agreement with Weksel and Bromberg according to which he purchased 50 percent of their IDI holdings and assumed control of the company. Immediately after defendant announced that he had assumed control of IDI, the brokerage firms that extended defendant margin credit began to call their loans.

NBC's loans to defendant, totalling more than $8 million, were significantly in excess of the bank's legal lending limit of about

---

**7.** It is unclear from the record whether Boynton or Fritz purchased any other shares of IDI on behalf of CBC during this period.

**8.** *See* Appendix to Plaintiff's Memorandum of Law in Support Of Its Motion for Summary Judgment, Deposition of Leonard Levy by SEC, June 21, 1984, at 102, *cited in* Plaintiff's Statement of Material Facts To Which There Is No Genuine Issue, at 14.

$700,000.[9] It is disputed by the parties whether the loans were made without at least the informal knowledge of the bank's board of directors and loan committee. Defendant points to two facts that suggest that the bank's board of directors may have been at least generally aware of defendant's borrowings. In deposition testimony [10] which defendant identifies as testimony elicited during a March 27, 1987 deposition of Richard Alan Williams, then director of NBC and CBC, Mr. Williams appears to state that a director of NBC—Mr. Clayton B. Neill, Jr.—was assigned to investigate the bank's loans to defendant during a meeting of the bank's board of directors in February of 1984. *See* [Defendant's] Opposition To Motion For Summary Judgment, January 11, 1989, Exhibit 18. Moreover, in what appears to be part of this same deposition, Mr. Williams states that the bank may have made several other loans in addition to its loans to defendant that were also above the legal lending limit. These facts cast some doubt on the plaintiff's assertion that NBC's board of directors suddenly discovered in early April of 1984 that Boynton and Fritz had been making substantial loans in violation of the bank's lending limits between January and April of 1984, and that the board would have halted the loans had they known that they were being made. Accordingly, drawing all reasonable inferences in favor of defendant, we assume for the purposes of plaintiff's motion for summary judgment that the board of directors was at least generally aware that significant additional loans were being advanced to defendant and that these loans exceeded the bank's legal lending limit.

In mid-April, NBC stopped honoring checks defendant wrote to meet his margin calls with various brokerage firms. The parties dispute whether defendant's substantial borrowings were a primary cause of IDI's ultimate financial instability and demise. Defendant cites other reasons as the primary cause of IDI's downfall, and for the purposes of deciding this motion for summary judgment we accept defendant's version of the events leading to IDI's bankruptcy.

## II. DISCOVERY–RELATED MOTIONS

■ Plaintiff has moved for sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure, and defendant has moved to extend the time-period for discovery [11] and to compel the plaintiff to produce certain documents requested in his document request.[12]

The court will grant plaintiff's motion for sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure. Plaintiff properly noticed the continuation of defendant's deposition by its Sixth Notice of Deposition, filed and served upon defendant's counsel on October 14, 1988, requiring defendant to attend the continuation of his deposition at plaintiff's offices at 10:00 a.m. on October 27, 1988. Review of the docket entries in this case reveals that defendant did not seek a protective order with regard to his deposition on October 27, 1988 or otherwise oppose that deposition.[13] Defendant failed to appear for his deposition scheduled for October 27, 1988.

9. Deposition of Donald Robert Nelson, October 17, 1988, at 12.

10. This deposition testimony, which plaintiff in his pleading identifies as a deposition of Richard Alan Williams, then director of NBC and CBC, taken on March 27, 1987, was clearly not undertaken in connection with this case. The complaint in this case was filed on January 21, 1988. A full copy of this deposition has not been made part of the record in this case.

11. In its order of October 7, 1988, this court ordered all discovery, including responses, to be complete on or before October 31, 1988.

12. Review of the docket entries in this case indicates that defendant has not filed any of his document requests with the Clerk of the Court, so the Court cannot verify that defendant's motion relates to a proper document request.

13. Since the court granted plaintiff's motion to compel deposition testimony on October 24, 1988, plaintiff was undoubtedly prejudiced by defendant's failure to appear for his deposition on October 27, 1988. In its order of October 7, 1988, this court ordered all discovery, including responses, to be complete on or before October 31, 1988.

Moreover, in its order of October 5, 1988, this court ordered defendant to produce all documents responsive to plaintiff's first request for production of documents that were in his possession, custody, and control, including those documents located at his present and former attorney's offices, at the offices of the Securities and Exchange in Washington, D.C. on or before October 12, 1988. At the hearing held on January 11, 1989, defendant argued that he did not produce certain documents because he believed that they were protected by an attorney-client privilege, but did not produce the documents even after the court in its order of October 24, 1988 addressed the scope of defendant's attorney-client privilege. Moreover, defendant has not moved for a protective order with regard to any such documents and did not assert any such privilege in his opposition to plaintiff's motion to compel the production of documents requested in its first request for production of documents, which motion the court granted in its order of October 5, 1988. For all of these reasons, the court shall grant plaintiff's motion for sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure and shall order defendant to produce the documents he was ordered to produce pursuant to this court's order of October 5, 1988 as well as its order of October 24, 1988 within twenty days of this memorandum opinion and order, and it shall further order defendant to attend a continued deposition if plaintiff chooses, within eleven days of this memorandum opinion and order, to notice such a deposition. Plaintiff may if it chooses renew its motion for summary judgment as to any remaining claims after conducting the additional discovery ordered in this memorandum opinion and order. Furthermore, as a sanction for defendant's noncompliance with plaintiff's discovery requests, and this court's discovery orders, this court shall deny defendant's motion to compel the plaintiff to produce certain documents. Also as a sanction pursuant to Rule 37 of the Federal Rules of Civil Procedure, and because this court believes that the parties have had ample opportunity to conduct discovery, defendant's motion to extend the time-period permitted for discovery shall be denied.

## III. SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(e) provides, *inter alia*, that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party ... must set forth specific facts showing there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Fed.R.Civ.P. 56(e). The Advisory Committee notes that the "very mission of the summary judgment procedures is to pierce the pleadings and to assess the proof to see whether there is a genuine need for trial." Fed.R.Civ.P. 56(e), Advisory Committee Note. Three Supreme Court cases decided in 1986 confirm this view, and highlight the usefulness of Rule 56(e) in disposing of cases, or parts of cases, that need not go to a jury. *See generally, Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (court should not send case to jury "unless evidence is of such a character that it would warrant a jury in finding a verdict in favor of that party"); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–89, 106 S.Ct. 1348, 1356–1357, 89 L.Ed.2d 538 (1986) ("[w]here record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."). Finally, the Federal Rules envision partial summary judgment in those cases, as here, where some, but not all, of the issues may properly be disposed of before trial. Fed.R.Civ.P. 56(a), (d). In addition, summary judgment is particularly appropriate in a non-jury

case such as this.[14] *See United States v. Matheson*, 532 F.2d 809, 813 (2nd Cir.1976), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976).

We are mindful that the party moving for summary judgment in this case has the burden of proving its claims by a preponderance of the evidence at trial. The United States Supreme Court has held that "the inquiry involved in a ruling on a motion for summary judgment ... necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Accordingly, the court in deciding plaintiff's motion for summary judgment must ask whether the fact-finder "could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...." 477 U.S. at 252, 106 S.Ct. at 2512.

## A. *Section 13(d)*

Section 13(d)(1) of the Securities Exchange Act provides in relevant part that:

Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title ... is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, [file] ... a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors....

15 U.S.C. § 78m(d)(1) (Supp.1988). The statute then lists certain information that the 13(d) statement must contain. Among other things, it must contain:

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other con-

sideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto....

....

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

15 U.S.C. § 78m(d)(1) (1981). Rule 13(d)–1 implements the statutory requirement for filing of Schedules 13D. 17 C.F.R. 240.-13d–1 (1983). Rule 13(d)–2 requires the filing of amendments to Schedules 13D. 17 C.F.R. 240.13(d)–2 (1983).

Section 13(d)(3) of the Exchange Act, furthermore, states that "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection." 15 U.S.C. § 78m(d)(3) (1981). Accordingly, the number of shares owned by two or more persons who, individually, have not purchased a sufficient number of shares to invoke the disclosure requirements of the statute, may be aggregated for the purposes of this statute if they are found to constitute a "group" under this provision.

Rule 13d–5(b)(1) states that for the purposes of section 13(d) of the Exchange Act "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting, or disposing of equity securi-

---

14. No jury demand was timely filed in this case. *See* Fed.R.Civ.P. 38(b). Moreover, no jury would be available in this SEC injunction action had it been timely demanded. *See S.E.C. v. Tome*, 833 F.2d 1086, 1096 n. 7 (2nd Cir.1987),

*cert. denied,* —— U.S. ——, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988); *S.E.C. v. Commonwealth Chemical Securities*, 574 F.2d 90, 96–97 (2nd Cir.1978); *S.E.C. v. Petrofunds, Inc.*, 420 F.Supp. 958, 959–60 (S.D.N.Y.1976).

ties of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership ... as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons." 17 C.F.R. § 240.13d–5(b)(1) (1983). Rule 13d–3, moreover, states that for the purposes of section 13(d) of the Act, "a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares ... [v]oting power ... [or] [i]nvestment power." 17 C.F.R. § 240.13d–3(a) (1983).

In sum, plaintiff claims that defendant violated section 13(d)(1)(B) by failing to disclose the source of funds used to purchase IDI stock, 13(d)(1)(E) by failing to disclose in his own Schedule 13D that he was acting in concert with Boynton and Fritz in purchasing IDI stock, and section 13(d)(3) by failing to file a Schedule 13D on behalf of he, Boynton, and Fritz as a "beneficial owner" under that subsection.

■ It is clear that defendant has violated section 13(d)(1)(B) of the Act by failing to reveal the source of the funds used to purchase the IDI stock. In his twelfth amendment to his Schedule 13D, defendant admitted that his previous Schedule 13D and amendments thereto were inaccurate in their failure to disclose that his purchases of IDI were funded substantially by money borrowed from NBC. At the hearing held on January 11, 1989, defendant admitted that his first Schedule 13D and the eleven subsequent amendments did not comply with section 13(d)(1)(B) in that they failed to disclose these borrowings. He asserted in his defense that he was misled by his lawyers, but scienter is not an element that plaintiff must prove under section 13(d). Accordingly, the court shall grant plaintiff's motion for summary judg-

ment as to its allegations premised on section 13(d)(1)(B).

■ The court shall also grant plaintiff's motion for summary judgment with regard to its allegations premised on sections 13(d)(1)(E) and (d)(3)[15] of the Exchange Act. The purpose of section 13(d) is "to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control...." *Securities and Exchange Commission v. Savoy Industries,* 587 F.2d 1149 (D.C.Cir.1978), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). Accordingly, the language of section 13(d)(3) has been construed broadly to achieve this objective. In order to find that a "group" exists under section 13(d)(3), a court must find that two or more people have formed a combination in support of a common objective. 587 F.2d at 1162–63. In addressing what was a sufficient "combination" for the purposes of imposing liability under section 13(d)(3) and Rules 13d–5(b)(1) and 13d–3, this Circuit, in *Savoy Industries,* held that it is "clear that whatever meeting of the minds, understanding, or arrangement that may exist need not be written. It is possible, indeed commonplace, for two or more to take concerted action informally.... The scope of section 13(d)(3) was clearly intended to extend beyond agreements and contracts in the classical contractual 'offer' and 'acceptance' sense." 587 F.2d at 1163; *see also Wellman v. Dickinson,* 682 F.2d 355 (2nd Cir. 1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983). In *Savoy,* the D.C. Circuit upheld the district court's holding that defendant was a member of a "group" who shared a common objective of obtaining control of Savoy Industries. The court upheld the district court's holding primarily on the basis of circumstantial evidence showing that appellant "had a rather

---

**15.** Since the language of Rule 13d–3 construing section 13(d)(3) of the Exchange Act, which addresses when a "group" shall be considered a "beneficial owner" within the meaning of section 13(d), closely tracks the language of section 13(d)(1)(E) of the Exchange Act, which addresses when the existence of such a "group" must be disclosed, we shall assume that the same standard applies under both and address together whether defendant has violated those two sections. Rule 13d–3 encompasses "any contract, arrangement, understanding, relationship, or otherwise," while section 13(d)(1)(E) encompasses "any contracts, arrangements, or understandings."

substantial interest in Savoy at the time of the negotiations and the deal resulting in the transfer of the 172,000 shares of Savoy stock." 587 F.2d at 1164. Moreover, the court upheld that district court's finding that appellant shared a "common objective" with his codefendants with respect to the purchase of Savoy stock, since he was involved in discussions with his codefendants concerning Savoy's management personnel following their takeover of the corporation, and concerning the business strategies that the newly-created corporation would carry out. Appellant, moreover, had substantial influence over another corporation that was named as a member of the acquiring "group" in that group's Schedule 13D. 587 F.2d at 1164–65. In another case, involving a "parking arrangement" whereby the defendant sought to avoid the necessity of filing a Schedule 13D by arranging to have a friend accumulate shares on his behalf, the United States District Court for the District of Columbia found a sufficient combination between the defendant and his friend to constitute a "group" under section 13(d)(3). The district court based this holding on findings that defendant had subtly "directed" his the shares, had subsequently encouraged his friend to continue accumulating the shares, and finally had obtained those shares from his friend at below market prices. *S.E.C. v. First City Financial Corp., Ltd.*, 688 F.Supp. 705, 722–24 (D.D.C.1988). In that case, the court explained that a combination may be found for the purposes of section 13(d)(3) on the basis of "any relationship that, *as a factual matter*, confers on a person a significant ability to affect how voting power or investment power will be exercised...." 688 F.Supp. at 721–22 (emphasis in original) (quoting 3 A.A. Sommer, Jr., Securities Law Techniques § 70.07[2][c] (1987)). While in *First City* the court found no explicit agreement between defendant and his associate, it found that defendant "had entered into an understanding with [his associate] which gave him a right to call the Ashland shares." 688 F.Supp. at 724.

In his opposition to plaintiff's motion for summary judgment, defendant does not address the plaintiff's factual allegations with respect to plaintiff's claim that defendant acted in concert with Boynton and Fritz in purchasing his IDI stock with the common objective of attaining control of IDI. With regard to this allegation, the relevant material issues to which there is no genuine dispute are as follows: 1) Defendant introduced Boynton and Fritz to his account executives after they expressed an interest in purchasing IDI stock for CBC; 2) Boynton subsequently purchased a substantial amount of IDI stock on behalf of CBC; 3) Defendant discussed his plans with regard to IDI with Boynton and Fritz; 4) Boynton flew to New York with defendant and accompanied defendant when defendant met with IDI executives and made his demands with regard to proposed management changes; 5) At the meeting with IDI executives, defendant stated that Boynton (and the 72,500 shares of IDI stock he had purchased on behalf of CBC) was part of the investor group to which he belonged, and this statement was made in a context where defendant was attempting to pressure IDI management to accept his demands; 6) Defendant asked Boynton and Fritz for more money to fuel his purchases of IDI stock every one or two weeks, which requests were always granted; 7) The loans to defendant were significantly in excess of the bank's legal lending limit, although the bank may have made several other loans also in violation of its legal lending limit; 8) After being told by defendant during a telephone conversation in late February or early March that "we'd have to make a decision on precisely what we were going to do" with respect to IDI, Boynton and Fritz accompanied defendant in a series of strategy meetings with investment bankers, the HWS lawyers, and others in New York which took place over a two or three day period; 9) Defendant together with Boynton and Fritz made a final decision about strategy with respect to the purchases of IDI during these meetings; 10) Defendant asked Boynton and Fritz if they would agree to become directors of IDI, and they both agreed. To the extent that defendant did not refute these facts in his opposition to plaintiff's

motion for summary judgment, the court shall take them as admitted pursuant to local rule 108(h). The pattern of cooperation and mutual consultation between defendant, Boynton, and Fritz clearly reveals Boynton and Fritz to have been far more than bankers diligently supervising their bank's investment in defendant and in IDI. Such diligent bankers may have kept track of what their borrower planned to do with his growing investment in IDI, and they may even have made their own investments in IDI on behalf of their bank. However, Boynton and Fritz did far more than this. They were clearly major participants in defendant's strategy decisions and even lasted through two or three days of meetings during which it was finally decided that defendant should continue making open market purchases of IDI stock. They did not merely advance defendant one or two loans, having concluded he and his plans represent, but instead fed him money in a haphazard hand-to-mouth manner and in an amount that violated the bank's legal lending limit by a significant amount. Most important, defendant (in Boynton's presence and without Boynton's objection) represented Boynton and the shares Boynton had purchased on behalf of CBC to be part of his "investor group" in order to add more muscle to his threat to carry out a proxy fight if his demands were not met by the then-current IDI management. Finally, defendant asked Boynton and Fritz to become members of IDI's board of directors, and they agreed. It is clear from these facts, viewed together, that Boynton and Fritz had an "understanding" with defendant that they would lend their IDI stock, their active input, as well as their bank's resources to defendant's effort to acquire IDI. Boynton and Fritz were active participants with defendant rather than mere observers. Accordingly, the facts which this court takes as admitted by defendant clearly show that a combination existed between Boynton, Fritz, and defen-

dant, and that they shared a common objective of acquiring control of IDI. There is no reasonable inference from these facts that Boynton and Fritz were merely observers to defendant's efforts to take control of IDI.

Section 13(d) "serves a vital public function to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed." *First City*, 688 F.Supp. at 725. To permit even informal understandings like that between defendant, Boynton, and Fritz to remain undisclosed to the public would subvert this policy. Defendant in purchasing his IDI shares intended to become a major actor in its affairs, and indeed he ultimately assumed control of the company by means of a "rapid aggregation or accumulation" of IDI stock. This "rapid aggregation or accumulation" of IDI stock, significantly, included not only the shares which defendant disclosed in his Schedule 13D and the amendments thereto, but it included also the shares purchased by Boynton and Fritz on behalf of CBC. Defendant, in Boynton's presence, used these shares purchased by Boynton and Fritz to add muscle to his efforts to force IDI's management to allow him to assume control of IDI's management, and it worked.[16] Moreover, that Boynton and Fritz were major participants in defendant's efforts to assume control of IDI suggested that they would become important figures in IDI's management once defendant's efforts succeeded. This is information that must necessarily be disclosed in order to alert the marketplace to a large aggregation of securities "which might represent a potential shift in corporate control." *Savoy*, 587 F.2d at 1149.

### B. *Section 10(b)*

Plaintiff has also moved for summary judgment as to its claims premised on section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5.[17] A violation of sec-

---

**16.** Boynton and Fritz held on behalf of CBC 72,500 of the 400,000 shares that defendant represented to be part of his investor group during his meeting with the management of IDI on January 27, 1984.

**17.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of

tion 10(b) and Rule 10b–5 occurs when a material misrepresentation or omission is made with scienter in connection with the purchase or sale of a security. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Aaron v. S.E.C.*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). The plaintiff alleges that defendant intentionally withheld from the lawyers preparing his Schedule 13D material information required to be disclosed in that schedule, namely the fact that he financed his purchases of IDI stock largely from money borrowed from NBC.[18] Pursuant to section 13(d)(1)(B) of the Exchange Act, defendant was required to disclose the source and amount of the funds borrowed for the purpose of acquiring IDI stock as well as a description of the loan transaction.[19]

■ With regard to the materiality element, we find on the basis of the facts about which there is no genuine issue that defendant's failure to disclose that his purchases of IDI stock were largely funded by money borrowed from NBC was a material omission in the circumstances of this case. The Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) addressed the meaning of materiality. In relevant part, the Court in *Northway* required a "showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." 426 U.S. at 449, 96 S.Ct. at 2132. The fact that this information is required to be disclosed under section 13(d) of the Exchange Act is strong evidence that it is material for the purposes of section 10(b) of that Act. Moreover, under the circumstances of this case, the fact that defendant purchased his IDI stock largely from borrowed funds rather than from personal funds would have assumed actual significance in the deliberations of a reasonable shareholder, since only with this information could a shareholder have fully evaluated and anticipated IDI's financial condition following the proposed takeover. For example, in *Corenco Corporation v. Schiavone & Sons, Inc.*, 362 F.Supp. 939, 948–49 (S.D.N.Y.1973), *rev'd in part on other grounds*, 488 F.2d 207 (2nd Cir.1973), defendants instituted a tender offer for plaintiff Corenco Corporation. In their Schedule 13D, defendants failed to provide financial information about themselves. In finding that the failure to provide such information represented a material omission, the court explained that "[o]ne ... example of financial information about [defendants] which would be material to a Corenco shareholder is the source of funds available to repay the bank loan taken by [defendants] to finance the tender offer." 362 F.Supp. at 949. In order to assess defendant's accumulation of IDI stock in this case, a shareholder would need to know

the mails, or any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) To engage in any act, practice, or course of business which operates as a fraud or deceit upon any person,

in connection with the purchase or sale of a security.

17 C.F.R. § 240.10b–5 (1983).

**18.** Defendant also omitted from his Schedule 13D the fact that he acted in concert with Boynton and Fritz, but since plaintiff does not appear to allege that defendant acted with scienter with respect to this omission in its motion for summary judgment, we do not address whether this particular omission was material for the purposes of section 10(b).

**19.** Section 13(d)(1)(B) in relevant part requires disclosure of

the source and amount of the funds or other consideration used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such a security, *a description of the transaction* and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c(a)(6) of this title, if the person filing such statement requests, the name of the bank shall not be made available to the public....

15 U.S.C. § 78m(d)(1)(B) (1981) (emphasis added).

that defendant's purchases were funded largely by borrowings from NBC. Such knowledge, among other things, would raise questions in the mind of a reasonable shareholder about the source of the funds to be used to repay defendant's loans as well as about defendant's relationship with his lender. Indeed, section 13(d)(1)(B) requires disclosure of not only the source of funds but also of a *description* of the loan transaction. Defendant would have had to disclose the fact that he had borrowed the funds on the basis of a series of short term notes. Such information would be essential to a reasonable shareholder in projecting the financial stability of IDI subsequent to the pending acquisition. Accordingly, defendant's failure to reveal in his Schedule 13D and amendments thereto that his purchases of IDI stock were substantially funded by money borrowed from NBC constitutes a material omission.[20] Accordingly, we shall grant plaintiff's motion for summary judgment as to the materiality element of its claim premised on section 10(b) of the Exchange Act.

■ Plaintiff's motion for summary judgment as to the scienter element of its section 10(b) claim, however, shall be denied. Scienter is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976), although "knowledge of what one is doing and the consequences of those actions" may also satisfy the scienter requirement, *see S.E.C. v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir.1980), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 569, 66 L.Ed.2d 471 (1980). Plaintiff alleges that defendant's lawyers questioned defendant at length about the source of the funds used to purchase IDI stock, and explained to him that he would have to disclose any borrowed funds; however, according to the plaintiff's allegations, defendant intentionally lied to his own attorneys in telling them that he used only personal funds and margin borrowings in purchas-

ing IDI stock. However, the plaintiff in making these allegations relies entirely on the deposition testimony of defendant's former attorneys. Defendant directly refutes the testimony of his former attorneys in his opposition to plaintiff's motion for summary judgment; according to defendant, his former attorneys informed him that he need not disclose his loans from NBC because they were not "specific" in nature. Since resolution of this issue turns entirely on credibility determinations—of defendant's former attorneys and of defendant himself—there remains a genuine issue of material fact as to whether defendant intentionally caused his former attorneys to fail to disclose his borrowings from NBC in his Schedule 13D and in his amendments thereto. Accordingly, plaintiff's motion for summary judgment shall be denied as to the scienter element of its section 10(b) claim.

Therefore, for the reasons stated in the memorandum opinion, and upon consideration of the entire record in this case, it hereby is

ORDERED, that plaintiff's motion for summary judgment is GRANTED with respect to its claims premised on sections 13(d)(1)(B), 13(d)(1)(E), and 13(d)(3) of the Exchange Act, and it further is

ORDERED, that plaintiff's motion for summary judgment is GRANTED with respect to the materiality element of its claim premised on section 10(b) of the Exchange Act, and it further is

ORDERED, that plaintiff's motion of summary judgment is DENIED with respect to the scienter element of its claim premised on section 10(b) of the Exchange Act, and it further is

ORDERED, that plaintiff's motion for summary judgment accordingly stands granted in part, so that plaintiff may if it wishes renew its motion for summary judgment with respect to any remaining claims after conducting the further discovery provided for herein, and it further is

---

**20.** This conclusion would not be weakened even if we accepted defendant's contention that other factors—other than his substantial debt to NBC —were primarily responsible for the demise of IDI. The loans from NBC need not have been a primary cause, or even a major cause, of IDI's collapse for the court to find the fact of the loans to be material information that would enter the actual deliberations of a reasonable shareholder.

ORDERED, that plaintiff's motion for sanctions is GRANTED, and it further is

ORDERED, that defendant shall produce the documents he was ordered to produce pursuant to this court's orders of October 5, 1988 and October 24, 1988 within 20 days of this memorandum opinion or face further sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure, and it further is

ORDERED, that defendant shall attend a continued deposition if plaintiff chooses, within eleven days of this memorandum opinion, to notice such a deposition, and it further is

ORDERED, that defendant's motions to compel the plaintiff to produce documents and to extend the time-period for discovery are DENIED, and it further is

ORDERED, that defendant's motion to dismiss and motion for Rule 11 sanctions against plaintiff are DENIED, and it further is

ORDERED, that plaintiff's motion to strike defendant's jury demand is GRANTED.

The court shall at this time postpone addressing plaintiff's request for relief with respect to the claims resolved in its favor in this memorandum opinion and order and shall join that issue when it addresses plaintiff's remaining claims.

SO ORDERED.