UNITED STATES of America, Appellee,

v.

**Paul A. BILZERIAN,**
**Defendant–Appellant.**

No. 787, Docket 89–1502.

United States Court of Appeals,
Second Circuit.

Argued Feb. 13, 1990.

Decided Jan. 3, 1991.

Charles Fried, Cambridge, Mass. (Langdell Hall, Cambridge, Mass. of counsel; Arthur F. Mathews, Stephen H. Sachs, Stephen F. Black, Joseph K. Brenner, Lee T. Lauridsen, W. Hardy Callcott, Mark J. Leimkuhler, Wilmer, Cutler & Pickering, Washington, D.C., also of counsel), for defendant-appellant.

David E. Brodsky, Asst. U.S. Atty., S.D. N.Y. (Roger S. Hayes, Acting U.S. Atty., John W. Auchincloss II, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Samuel J. Buffone, Washington, D.C. (Asbill, Junkin, Myers & Buffone, Chartered, Washington, D.C., of counsel), filed a brief for amicus curiae National Ass'n of Criminal Defense Lawyers.

Before LUMBARD, CARDAMONE, and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

One of the principal questions posed by this appeal is whether the availability of civil proceedings—often used to enforce the securities laws—forecloses the government from instituting criminal prosecution for the violation of these same laws. The complex contrivances revealed in the present record, such as "parking" stock at a brokerage firm in order to create the impression that the stock has been sold, or having a broker "accululate" stock on an investor's behalf in order to delay disclosure of the purchase, carry home the meaning of Scott's "O, what a tangled web we weave, When first we practice to deceive!" 2 Sir Walter Scott, *Marmion*, Canto VI, XVII (Little Brown & Co. 1857). Although these schemes are not specifically dealt with in the securities laws, the Securities Exchange Act nonetheless contains a general antifraud provision and other federal laws prohibit conspiracy, fraud, and making false statements to United States agencies. This appeal addresses the propriety of enforcing the complained of trading methods through these general fraud and false statement provisions.

Appellant Paul A. Bilzerian (hereafter referred to as Bilzerian or defendant) was convicted on nine counts of an indictment charging violations of securities fraud, making false statements to the Securities and Exchange Commission (SEC), and conspiracy to commit specific offenses, and to defraud the SEC and the Internal Revenue Service (IRS). The charges relate to transactions defendant made between May 1985 and October 1986 in the common stock of four companies: Cluett, Peabody and Company, Inc. (Cluett), Hammermill Paper Company (Hammermill), H.H. Robertson Company (Robertson) and Armco Steel (Armco). On September 29, 1989, the United States District Court for the Southern District of New York (Ward, J.), entered a judgment of conviction and sentenced Bilzerian to four years in prison and a $1.5 million fine.

## FACTS

### A. *The Underlying Transactions*

#### 1. The Cluett Transactions

The indictment charged three fraudulent schemes relating to trades in Cluett. These involved misrepresenting the source of funds used to purchase stock, secretly accumulating stock through nominee, and misrepresenting an "open market" purchase. By agreeing to share any profits and by guaranteeing against any loss, Bilzerian in April and May of 1985 raised $9 million to buy Cluett stock from various individual investors. The funds were transferred to him through a series of trusts set up for that purpose. Defendant was required to disclose purchase of this large block of stock on a form filed with the SEC known as a Schedule 13D. On the 13D, and its amendment, respecting the Cluett purchase, defendant stated that the stock was purchased with "personal funds," and did not disclose that they were

raised from other investors with whom he had a profit-sharing and guarantee-against-loss agreement.

Bilzerian also engaged an employee of Jeffries & Company, Inc. (Jeffries), a registered broker-dealer, to accumulate stock on his behalf. Under stock accumulation, a broker-dealer purchases stock in its own account with the understanding that the customer will buy it at a later date at the broker's cost plus interest and commissions. In such a transaction the prearranged sale involves no risk of loss to the broker-dealer, who acts as a nominee for the true purchaser. On May 28, 1985 defendant purchased the accumulated stock without revealing the accumulation arrangement to the SEC. The indictment charged that the agreement was fraudulently designed to delay the reporting requirements of the securities laws.

Bilzerian also agreed to purchase 347,567 shares of Cluett common stock from a group of shareholders in contemplation of making a tender offer for that company, offering between $38 and $40 per share depending on the price of his tender offer. This proposed purchase was made with the understanding that the trade would not settle for 45 days and that defendant would cancel the purchase proposal if a third party offered more for the shares. Although he learned that 66,667 of the shares included in this block were already under his control, defendant advised the shareholder group to proceed with the sale. The offering statement claimed that 347,567 shares were purchased "in an open market transaction." The existence and terms of the privately-negotiated transaction were not disclosed.

The indictment alleged that the Cluett transactions violated §§ 10(b) and 32 of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b) and 78ff (Count One), and the federal false statements statute, 18 U.S.C. § 1001 (Counts Two, Three, and Four). Defendant was also charged with conspiring to defraud the SEC and to commit specific offenses in violation of 18 U.S.C. § 371 (Count Eight).

### 2. The Hammermill Transactions

In June 1986 defendant raised $8 million from an individual investor for the purpose of purchasing Hammermill stock. These funds were made available to him through a trust upon his agreeing to share any profits from the eventual sale of the stock. Bilzerian turned the funds over to a limited partnership—of which he was the general partner—and the partnership made the tender offer for Hammermill. The disclosure relating to the stock purchase and tender offer stated that defendant's contribution to the partnership was from "personal funds."

Once again, defendant arranged to have an employee of Jeffries accumulate Hammermill stock on his behalf. On July 21, 1986 he purchased 551,000 accumulated shares of Hammermill. Although he was required to disclose the acquisition as of July 7, he failed to file until July 25, and at that time did not disclose the accumulation agreement. The Hammermill transactions were alleged to violate 15 U.S.C. §§ 78j(b) and 78ff (Count Five), 18 U.S.C. § 1001 (Counts Six and Seven) and 18 U.S.C. § 371 (Count Eight).

### 3. The Robertson and Armco Transactions

Defendant also engaged in "stock parking" transactions in shares of Robertson and Armco. "Parking" refers to a transaction in which a broker-dealer buys stock from a customer with the understanding that the customer will buy the stock back at a later date for the purchase price plus interest and commissions. As with "accumulation" there is no market risk to the broker-dealer who is the owner of the shares in name only.

Bilzerian arranged to park 58,000 shares of Robertson with Jeffries for 30 days. Although he assured Jeffries he would repurchase the stock, the stock price fell substantially in the interim and he refused to honor his commitment. As a result, Jeffries incurred a $250,000 loss. Defendant compensated Jeffries in part for this loss by generating approximately $125,000 in commissions for the broker. He paid the

remaining $125,000 with the understanding that it would be refunded when an additional $125,000 of commissions was generated. Jeffries sent Bilzerian a false invoice in the amount of $125,000 for "financial services" that were never performed, and the latter deducted the payment on a 1985 tax return. When additional commissions were generated in 1986 he sent Jeffries fictitious invoices for "consulting services" seeking a refund of the $125,000.

Defendant also arranged to park 306,600 shares of Armco with Jeffries for a 30–day period beginning September 2, 1986. In addition, Jeffries agreed to accumulate Armco stock in its own account on defendant's behalf and then sell him the accumulated stock when he repurchased the 306,-600 shares. On October 2 defendant purchased 818,900 shares of Armco from Jeffries at the prevailing market price of $8 per share. Although the broker realized a $575,000 gain on the sale, the profits belonged to defendant by virtue of the stock parking and accumulation agreements. Defendant sent his broker an invoice for fictitious "consulting services" in order to account for the profits he realized on the trade.

For his part in the Robertson and Armco trades, Bilzerian was charged with conspiring to defraud the SEC and the IRS and to commit specific offenses including violations of 15 U.S.C. §§ 78g, 78q, and 78ff (1988) and 18 U.S.C. § 1001, in violation of 18 U.S.C. § 371 (Count Nine).

### B. *The Trial*

At trial defendant argued that he did not intend to violate the securities laws, but believed the financing structure of the transactions, utilizing trusts to borrow funds, would allow him legally to avoid disclosure regarding other investors, and that describing the source of his funds as "personal" was lawful. A motion was made *in limine* seeking a ruling permitting him to testify regarding his belief in the lawfulness of describing the source of his funds as "personal" without being subjected to cross-examination on communications he had with his attorney on this subject, discussions ordinarily protected by the attorney-client privilege.

Declining to rule on the issue in the abstract, Judge Ward stated that if defendant testified regarding his good faith regarding the legality of the disclosure, it would open the door to cross-examination with respect to the basis for his belief, and that such cross-examination would allow inquiry into communications with his attorney. Thus, defendant did not testify regarding his good faith, and now claims the trial court's ruling prejudiced his defense and infringed his constitutional right to deny each element of the charge against him. Error is also claimed in several evidentiary rulings made at trial, including the district court's decision to admit expert testimony by a government witness on the legal requirements of the federal securities laws, while excluding similar expert testimony offered by the defense. Additionally, defendant challenges the admission into evidence of a $4 million tax return error on an unrelated personal tax return.

Beyond the challenge that his right to a fair trial was prejudiced, Bilzerian asserts fundamental errors in the prosecution of this case. Specifically, he contends that prosecution under the general false statements statute was improper in light of the existence of more specific securities laws covering the same conduct, that any misstatements or omissions made on securities filings were immaterial, and that he was improperly charged under the "defraud" clause of the federal conspiracy statute rather than the more specific "offense" clause.

### DISCUSSION

### I. CHALLENGES TO THE CONDUCT OF THE TRIAL

#### A. *Attorney–Client Privilege*

Defendant contends the testimony he sought to introduce regarding his good faith attempt to comply with the securities laws would not have disclosed the content or even the existence of any privileged communications or asserted a reliance on counsel defense. As such, he continues,

the attorney-client privilege would not be waived by his testimony and, therefore, the trial court committed reversible error when it denied his motion *in limine* seeking to protect the privilege. He alleges that this ruling, together with similar rulings made during the course of the trial, prevented him from refuting the charge that he acted with criminal intent—a central element of the government's case—and that his constitutional right to "the fullest opportunity to meet the accusation against him.... [and] to deny all the elements of the case against him," *Walder v. United States*, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954), was thereby encroached upon.

Professor Wigmore tells us that the attorney-client privilege, dating back to the 1600s, is the most ancient of the confidential communication privileges. Originally, it was the attorney's privilege; today, it is recognized as the client's. *See* 8 J. Wigmore, *Evidence* § 2290, at 542–44 (McNaughton rev.1961). It may have arisen—with the advent of testimonial compulsion in Elizabethan England—as a judicial extension of the right of individuals to avoid self-incrimination. *Id.* at 543–44; Note, *Developments in the Law: Privileged Communications*, 98 Harv.L.Rev. 1450, 1502 (1985).

The purposes for the privilege are twofold: first, it assures that a person seeking legal advice may do so safely. Its existence therefore encourages the full and truthful revelation by the client of all the facts in his possession. Second, no attorney can represent a client effectively unless the client discloses fully all the facts in his possession. Thus, the privilege "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The fundamental purpose of the privilege is to " 'encourage full and frank communication between attorneys and their clients.' " *United States v. Zolin*, 491 U.S. 554, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989) (quoting *Upjohn*, 449 U.S. at 389, 101 S.Ct. at 682).

Although the underlying rationale for the privilege has changed over time, it has retained its importance in the common law tradition. *Id.* 109 S.Ct. at 2625–26; *see United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989). The potential societal benefit may be great in cases like the one at bar, where defendant seeks legal advice in order to act within the confines of highly complex federal securities laws. Often the importance of the interests promoted by the privilege justify the exclusion of otherwise relevant evidence. *See McCormick on Evidence* § 72 at 152 (E. Cleary 2d ed. 1972).

■ However, the attorney-client privilege cannot at once be used as a shield and a sword. *See In re von Bulow*, 828 F.2d 94, 103 (2d Cir.1987); *see also Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) ("The privilege takes flight if the relation is abused."). A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes. *See von Bulow*, 828 F.2d at 101–02. Thus, the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications. *See United States v. Exxon Corp.*, 94 F.R.D. 246, 249 (D.D.C.1981) (claim of good faith reliance on governmental representations waived attorney-client privilege); *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash.1975) (assertion of qualified immunity defense waived attorney-client privilege). This waiver principle is applicable here for Bilzerian's testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue. His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent.

In support of his argument that asserting a good faith defense does not waive the attorney-client privilege, Bilzerian points to *United States v. White*, 887 F.2d 267 (D.C.

Cir.1989). In that case attorney-client communications were admitted at trial over defense counsel's objection, in part because defendant's assertion of lack of intent was deemed to have waived the privilege. In reversing White's conviction the court stated: "[a] rule thus forfeiting the privilege upon denial of *mens rea* would deter individuals from consulting with their lawyers to ascertain the legality of contemplated actions...." 887 F.2d at 270. Because intent is an element of the case that the government must prove, the court continued, waiver of the attorney-client privilege based in denial of intent "would cut short both the privilege and the right." *Id.*

Denial of an essential element of the crime charged—here criminal intent—is a constitutional right to be carefully safeguarded. But *White* is distinguishable because the district court's ruling in the instant case did not prevent defendant from denying criminal intent; the district judge merely said that Bilzerian's own testimony as to his good faith would open the door to cross-examination, possibly including inquiry into otherwise privileged communications with his attorney. Defendant was free to deny criminal intent either without asserting good faith or to argue his good faith defense by means of defense counsel's opening and closing statements and by his examination of witnesses.

Another important distinction between *White* and the case at bar is that in the former the privileged communications were actually admitted at trial, allowing the appellate court an opportunity to examine whether defendant's case was or was not prejudiced. *See White*, 887 F.2d at 272. Because defendant did not testify as to his good faith, the privileged communications were not introduced at trial. Hence, the trial court's ruling and our review of defendant's claims lack a specific factual context within which to determine if the defense was actually prejudiced. *See Luce v. United States*, 469 U.S. 38, 41, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984) ("A reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context."). The district court took great pains to point out that application of the privilege would hinge on the testimony elicited on direct examination. In response to defense counsel's statement that "[t]he government presumably then would be able to call the attorney because the privilege is gone," the court stated:

> I am not going to go to that point. It may be that the government would be bound by the answer of the witness but I am not going to get to that point because I don't think I have to at this juncture. I don't know how this is going to play out. Until I do, I think it is inappropriate for me to give any advisory opinion.

■ In effect, defendant was seeking an advisory ruling in advance, assuring that the attorney-client privilege would not be waived regardless of what developed in his direct testimony. In order for the privilege to operate effectively defendants must be able to rely on its protection, *see In re von Bulow*, 828 F.2d at 100 ("An uncertain privilege—or one which purports to be certain, but results in widely varying applications by the courts—is little better than no privilege."), but courts cannot sanction the use of the privilege to prevent effective cross-examination on matters reasonably related to those introduced in direct examination. *Cf. McGautha v. California*, 402 U.S. 183, 215–17, 91 S.Ct. 1454, 1471–72, 28 L.Ed.2d 711 (1971) (defendant testifying on punishment issue in a bifurcated proceeding could not assert privilege against self-incrimination on issue of guilt); *Walder*, 347 U.S. at 63–65, 74 S.Ct. at 355–56 (defendant who lied on witness stand not permitted to use exclusionary rule as shield against impeachment).

A district court's finding that a defendant has waived the attorney-client privilege is reviewed under the abuse of discretion standard. *See In re von Bulow*, 828 F.2d at 101. Here the district court's ruling did not prevent the defense from urging lack of intent. Accordingly, the refusal to grant Bilzerian blanket protection from an implied waiver of the attorney-client privilege was not an abuse of discretion.

Bilzerian asserts the court ruled that even his own testimony regarding the steps

he took to change the structure of his financing arrangements would waive the privilege. He argues that testimony about underlying facts cannot waive the privilege, because the attorney-client privilege does not extend to underlying facts. *See Upjohn,* 449 U.S. at 395–96, 101 S.Ct. at 685–86. To the contrary, the trial court held only that Bilzerian's testimony about the changes would open the door on cross-examination to inquiry into Bilzerian's reasons for making the changes, because the topic would necessarily involve Bilzerian's state of mind. Even defendant's trial counsel knew the testimony about the changes would be inextricably intertwined with Bilzerian's assertion of good faith. Counsel said: "Mr. Bilzerian's response would be in substance that he directed these changes to be made so that—in order to enable himself to be able to report as personal funds on the 13D the funds that he received from the trust that he would not have to disclose any of the investors' names and that he thought that doing that, that he believed that was appropriate and proper". The trial court's ruling left defendant free to testify without getting into his state of mind, but correctly held that if he asserted his good faith, the jury would be entitled to know the basis of his understanding that his actions were legal.

### B. *Expert Testimony*

■ Defendant next contends that his ability to defend himself was unfairly prejudiced by the trial court's rulings on the admissability of expert testimony. The court erred, he says in allowing Professor John C. Coffee, a government expert witness, to testify regarding the requirements of Schedule 13D concerning disclosure of the source of funds and arrangements and understandings with others.

■ Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts. Its use must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in

applying that law to the facts before it. *See United States v. Scop,* 846 F.2d 135, 139–40, *modified,* 856 F.2d 5 (2d Cir.1988); *Marx & Co., Inc. v. Diners' Club, Inc.,* 550 F.2d 505, 510–11 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977).

■ As a general rule an expert's testimony on issues of law is inadmissible. *See generally,* Note, *Expert Legal Testimony,* 97 Harv.L.Rev. 797 (1984). The *Marx* and *Scop* cases distinguish between factual conclusions that may be included in an expert's testimony—though they embrace an ultimate issue to be decided by the jury—and opinions embodying legal conclusions that encroach upon the court's duty to instruct on the law. *See Scop,* 846 F.2d at 142; *Marx,* 550 F.2d at 512. In *Marx,* it was held that an expert's legal opinion on the meaning of certain contract terms was outside the witness' area of expertise and was also an invasion of the court's authority to instruct the jury on the applicable law. 550 F.2d at 509–510. In *Scop,* an expert's repeated statements that defendants' conduct established a manipulative and fraudulent scheme within the meaning of the securities laws exceeded the permissible scope of opinion testimony. 846 F.2d at 139. These cases establish that although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts.

■ Unlike *Scop* and *Marx,* the government's expert in the present case did not give his opinion as to whether Bilzerian's actions violated the securities laws. As the government's first witness, much of Professor Coffee's testimony was general background on federal securities regulation and the filing requirements of Schedule 13D, which he presented by referring to a blank form. Although Professor Coffee did answer a few questions based on hypothetical facts, the use of hypotheticals was first introduced by the defense on cross examination. The mere use of hypotheticals does not usurp the jury's function of applying the law to the facts of the case. *See Scop,* 846 F.2d at 143. Further, since

the expert's general testimony was not objected to at trial, the issue was waived. *See United States v. Heinemann*, 801 F.2d 86, 96 (2d Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987).

Following a specific objection that Professor Coffee's testimony constituted an impermissible legal instruction, Judge Ward limited his testimony regarding 13D's requirements by asking the jury to read specified instructions on the blank Schedule 13D and to ask Professor Coffee to clarify any ambiguity in the instructions. In addition, the trial judge gave a limiting instruction indicating that the expert's testimony was simply background information:

> Professor Coffee is here to furnish you with background concerning the meaning of terms, the procedures which are followed and his opinion as to the reason for these procedures. He is not here to give his opinion as to what the law requires. That is a matter which must be presented to you by the court.

With respect to the admission or exclusion of expert evidence, we defer to the trial judge's broad discretion unless his decision is clearly wrong. *See Salem v. United States Lines*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *United States v. Daly*, 842 F.2d 1380, 1387 (2d Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). In view of the general background nature of the unobjected to testimony and the court's limiting instruction to defense counsel, we see no abuse of discretion in admitting the expert testimony.

▮ Bilzerian argues further that the trial court erred in limiting the testimony of his expert witness, Lee B. Spencer, Jr., former director of the SEC's Division of Corporate Finance. The defense sought to elicit that the phrase "personal funds," as generally understood in the securities industry, includes funds derived from loans of the type received by defendant. It hoped to demonstrate with this evidence defendant's good faith in completing the disclosure form. Judge Ward excluded this proof because it related directly to the issue of whether Bilzerian's actual 13D disclosures complied with the legal requirements. Thus, the expert testimony would have constituted an impermissible instruction on governing law. Defense counsel was informed that it would have an opportunity to submit proposed jury instructions regarding the scope of "personal funds."

▮ Although testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice, *Marx*, 550 F.2d at 509, testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissable, and may not be made so simply because it is presented in terms of industry practice. Several hypothetical questions posed to Mr. Spencer included the particular facts alleged in the indictment, blurring the line between testimony regarding industry practice and an opinion on the legality of defendant's conduct. It does not appear that the trial court's ruling was clearly wrong or that the limits placed on Spencer's earlier testimony prejudiced the defense.

### C. Admission of Evidence Regarding Bilzerian's 1986 Personal Tax Return

▮ Defendant next alleges that the district court abused its discretion in admitting evidence of a $4 million error made on his 1986 personal income tax return. The evidence was part of the testimony given by Brian Murphy, a former senior tax manager with the accounting firm of Peat Marwick Main & Co. who had done accounting work for some partnerships in which defendant participated. On direct examination the government elicited testimony that during Murphy's preparation of tax returns for Bilzerian's Hammermill-related partnerships, Bilzerian stated that the source of his contribution to the partnership was personal funds. The trial evidence indicated to the contrary that the money was borrowed.

On cross-examination, the defense sought to establish that the source of funds was irrelevant for tax purposes and

that the tax returns filed on behalf of the partnerships, including the Bilzerian contribution, were correct. On redirect the government elicited the fact that defendant had underreported income from the Hammermill transaction on his personal tax return for 1986 by approximately $4 million.

The trial court stated since a partnership pays no income taxes, the testimony given on cross-examination regarding the accuracy of partnership returns created the impression that defendant had accurately reported his income from the Hammermill transaction. As such, the door had been opened to correct the false impression, including inquiry into defendant's personal tax returns.

Bilzerian asserts the evidence was inadmissable pursuant to Rules 403 and 404(b) of the Federal Rules of Evidence. Rule 404(b) prohibits the introduction of "other crimes, wrongs, or acts" for the purpose of demonstrating defendant's propensity to commit the charged crime. Fed.R.Evid. 404(b). The district court noted the evidence was not admitted for that improper purpose, but in order to rebut a false impression that had been created. Redirect may of course be used to rebut false impressions arising from cross-examination, and the scope of such redirect is within the trial court's broad discretion. *United States v. Mang Sun Wong*, 884 F.2d 1537, 1544 (2d Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 1140, 107 L.Ed.2d 1045 (1990).

■ Rule 403 permits the court to exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The weighing of relevance under Rule 403 may be altered when a false impression is created by earlier testimony. That is, evidence whose probative value might not ordinarily outweigh its prejudicial effect if offered on direct examination is admissable to rebut testimony elicited on cross examination that created a false impression. *United States v. Mar-*

*tinez*, 775 F.2d 31, 37 (2d Cir.1985). Balancing relevance against prejudice under Rule 403 is in the hands of the trial court and will not be overturned unless its ruling is arbitrary or irrational. *See United States v. Esdaille*, 769 F.2d 104, 108 (2d Cir.), *cert. denied*, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985).

The deficiency in Bilzerian's personal tax return was not relevant to the charge of conspiracy to defraud the IRS or to any other charge in the indictment. In addition, the testimony on cross examination related only to defendant's partnership tax return. His personal return at most had a tenuous connection to the issues at trial. Yet, the fact of his tax error was introduced without objection when he was cross-examined. In such context the evidence was admissable under Fed.R.Evid. 611(b) as probative of his veracity. The trial court was in the best position to judge whether a false impression was created by Murphy's cross-examination, and the decision to admit this evidence was within trial court's discretion. Here, in addition, Judge Ward gave a limiting instruction stating that the contested evidence was to be considered only in evaluating Murphy's testimony regarding his preparation of the partnership returns. Thus, the rulings on the admissability of the tax error were proper.

## II. ALLEGED PROSECUTORIAL FAILURES

### A. Liability Under § 10(b) and Rule 10b–5

■ Again, Bilzerian contends the securities fraud convictions cannot be sustained because any misstatements or omissions made, including the delays in disclosing his stockholdings, were not material. The securities fraud counts charged that in connection with the Cluett and Hammermill transactions defendant violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (1988),[1] and Rule 10b–5 of the regulations

1. Section 10 of the Exchange Act, 15 U.S.C. 78j (1988), provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of

promulgated thereunder, 17 C.F.R. § 240.10b–5 (1990)[2]. Section 10(b) and Rule 10b–5 prohibit fraudulent practices in connection with the purchase or sale of a security, including the knowing misrepresentation or omission of material facts.

Section 10(b) was designed to protect investors engaged in the purchase and sale of securities by implementing a policy of full disclosure. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 477–78, 97 S.Ct. 1292, 1303–04, 51 L.Ed.2d 480 (1977). The § 10(b) convictions were largely based on misrepresentations made on Schedules 13D and 14D–1 concerning the source of the funds used for the transactions and on the untimely filing of the forms. Some background on the filing requirements relating to Schedule 13D and Schedule 14D–1 is helpful to understanding this portion of the case. Both forms are reports filed with the SEC and made available to the public. They disclose the acquisition of a significant amount of stock in a publicly traded company. Schedule 14D–1, 17 C.F.R. 240.-14d–100 (1990), discloses the commencement of a tender offer for the stock of a public company. *See Finnegan v. Campeau Corp.,* 915 F.2d 824 (2d Cir.1990). Schedule 13D, 17 C.F.R. § 240.13d–101 (1990), the focus of this prosecution, discloses that an investor has acquired beneficial ownership of five percent or more of the stock of a public company.

Pursuant to § 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1) (1988),[3] defendant was required to file a Schedule 13D within ten days after he became the beneficial owner of five percent of the stock of Cluett and Hammermill. Section 13(d)'s purpose is to "alert investors to potential changes in corporate control so that they [can] properly evaluate the company in which they had invested or were investing." *GAF Corp. v. Milstein,* 453 F.2d 709, 720 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *see also Mayer v. Chesapeake Ins. Co.,* 877 F.2d 1154, 1162 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 722, 107 L.Ed.2d 741 (1990) (purpose of § 13(d) is to alert marketplace and permit investors to assess potential for change in corporate control). In addition to background information about the persons purchasing the stock, § 13(d) specifically requires disclosure of:

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds

---

the mails, or of any facility of any national securities exchange—

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**2.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate

as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1990).

**3.** Section 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1) (1988), provides in pertinent part:

Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title ... is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—. . . .

or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto ...

. . . . . . .

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

15 U.S.C. § 78m(d)(1).

■■■ A duty to file under § 13(d) creates the duty to file truthfully and completely. *SEC v. Savoy Industries,* 587 F.2d 1149, 1165 (D.C.Cir.1978), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); *GAF,* 453 F.2d at 720. Although § 13(d) is a reporting requirement rather than an antifraud provision, criminal penalties are available against one who knowingly makes a false and misleading statement of material fact on a document required to be filed by the securities laws. 15 U.S.C. § 78ff. In addition, a false or misleading statement made on a Schedule 13D may be actionable under the antifraud provision of § 10(b). *GAF,* 453 F.2d at 720; *see also Kamerman v. Steinberg,* 891 F.2d 424, 431 (2d Cir.1989). In either case, materiality of the misstatement or omission is a prerequisite to liability.

■■■ Contending there were no material misstatements or omissions to support his § 10(b) convictions, defendant argues first that the absence of any market fluctuation in Cluett stock immediately after his 13D was filed demonstrates that the information was not important to investors. Second, he asserts, the source of the funds he used was not material because he could have lawfully avoided disclosing his investors' identities by channeling the money

through limited partnerships rather than trusts. From this premise he reasons that because the investors' identities could have been concealed, the fact that an unnamed other person was investing with him was not a material fact.

The standard of materiality under the securities laws was set forth by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. *Id.* at 449, 96 S.Ct. at 2132; *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Determination of materiality is a mixed question of law and fact that the Supreme Court has stated is especially well suited for jury determination. *TSC,* 426 U.S. at 450, 96 S.Ct. at 2133 ("The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts ... and these assessments are peculiarly ones for the trier of fact.")

■■■ Turning to defendant's first point, whether a public company's stock price moves up or down or stays the same after the filing of a Schedule 13D does not establish the materiality of the statements made, though stock movement is a factor the jury may consider relevant. *See Akerman v. Oryx Communications, Inc.,* 609 F.Supp. 363, 368 (S.D.N.Y.1984), *aff'd,* 810 F.2d 336 (2d Cir.1987); *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 15–16 (2d Cir.1977). With respect to the second point, we decline to hold that the information required to be disclosed in 13D is material *per se* for purposes of § 10(b) simply because such disclosure is required under the securities laws. But the fact that the information is required to be revealed under § 13(d) is evidence of its materiality. *SEC v. Levy,* 706 F.Supp. 61, 72 (D.D.C.1989).

After hearing the evidence in this case the jury concluded that the misstatements and omissions were material. Defendant faces a heavy burden when challenging the

sufficiency of the evidence leading to his conviction. *See United States v. Zabare,* 871 F.2d 282, 286 (2d Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989). If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the conviction must be affirmed. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

It was not unreasonable for the jury to conclude that erroneously describing the source of funds as "personal" was material, for it indicated the honesty and feasibility of Bilzerian's plans for the investment. *See Savoy,* 587 F.2d at 1166–67 (failure to disclose participation of a certain investor violated § 13(d) and was material under § 10(b)); *Levy,* 706 F.Supp. at 73 (failure to reveal on 13D that stock purchase was funded with borrowed money was material under § 10(b)). It was also reasonable for the jury to find that defendant engaged in a fraudulent scheme to avoid the disclosure requirements of § 13(d). *See SEC v. First City Financial Corp., Ltd.,* 688 F.Supp. 705, 724 (D.D.C. 1988), *aff'd,* 890 F.2d 1215, 1228 (D.C.Cir. 1989) (stock parking arrangement used to delay filing Schedule 13D violated § 13(d)). Since the question of materiality is especially well suited for jury determination, and defendant has not demonstrated a lack of sufficient evidence to support that body's conclusion, there is no basis to set aside the securities fraud convictions.

B. *Liability Under 18 U.S.C. § 1001*

█ For making false statements on the Forms 13D and 14D–1 filed with the SEC, Bilzerian was charged with violating the general false statements statute, 18 U.S.C. § 1001, rather than the more specific securities law provisions. He contends that the government's prosecution under § 1001 was an unprecedented attempt to impose criminal penalties without complying with the specific requirements for criminal prosecution under the 1934 Act.

█ Section 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001 (1988). The statute was designed "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941); *see also United States v. Fitzgibbon,* 619 F.2d 874, 877–78 (10th Cir.1980) (describing legislative history). To support a conviction under § 1001, the government must establish that the defendant (1) knowingly and willfully (2) made a statement (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious and fraudulent. *See United States v. Silva,* 715 F.2d 43, 49 (2d Cir.1983). Under our decisions, materiality of the statement is not an element of the offense. *See United States v. Elkin,* 731 F.2d 1005, 1009 (2d Cir.), *cert. denied,* 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984); *United States v. Silver,* 235 F.2d 375, 377 (2d Cir.), *cert. denied,* 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956).

Defendant asserts that it was Congress' purpose to have criminal prosecutions, for misstatements in informational reports filed with the SEC, brought under § 32(a) of the Exchange Act, 15 U.S.C. § 78ff, a specific enforcement provision setting forth criminal penalties for willful violations of the securities laws and the applicable rules and regulations. Unlike the false statements statute, § 32(a) requires proof of materiality and contains a provision that imprisonment will not be imposed on a defendant who was ignorant of the substance of the rule. In pertinent part it provides:

Any person who willfully violates any provision of this chapter ... or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required ... or any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed ... which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $1,000,-000, or imprisoned not more than 10 years, or both ...; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

15 U.S.C. § 78ff (1988).

It is settled law that "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *United States v. Batchelder,* 442 U.S. 114, 123–24, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979). Prosecution has additionally been permitted under § 1001 despite the existence of other overlapping and more specific false statement statutes. *United States v. Gordon,* 548 F.2d 743, 744 (8th Cir.1977); *see also, e.g., United States v. Grotke,* 702 F.2d 49, 54 (2d Cir.1983) (§ 1001 applicable despite more specific currency reporting statute.).

Defendant argues that in the case of alleged misstatements or omissions in informational reports filed under the Exchange Act, Congress planned that § 32(a) and not § 1001 control. At the time § 1001 was enacted—only 12 days after the Exchange Act was passed—it provided harsher penalties than § 32(a), though the requirements for conviction under § 1001 were less stringent. Nonetheless, proximity of the enactments without more does not suggest that the application of the false statements statute was to be limited by the just-enacted securities laws. Absent more explicit indicia of Congressional purpose to foreclose the use of § 1001, the general rule that criminal statutes may overlap controls. The fact that less proof is required for conviction under § 1001 does not

amount—as defendant alleges—to overriding the requirements of § 32(a).

■ Defendant also asserts that statements made on Schedules 13D and 14D–1 are not matters "within the jurisdiction of" the SEC because with respect to these statements the SEC is merely a repository of information and does not act upon the statements. It is his view that § 1001 is appropriate only for misstatements or omissions (1) made during an active governmental inquiry or (2) that formed the basis for some sort of governmental action.

■ The Supreme Court has stressed that the term "jurisdiction" in § 1001 should be broadly construed. An agency has jurisdiction within the meaning of the statute when it has authority to act upon the information. *See United States v. Rodgers,* 466 U.S. 475, 479–80, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984); *United States v. Adler,* 380 F.2d 917, 922 (2d Cir.), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967). "A statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001." *Bryson v. United States,* 396 U.S. 64, 71, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969).

A statutory basis for the SEC's request for information exists because the Exchange Act requires the documents at issue to be filed with it. 15 U.S.C. §§ 78m(d), 78n(d) (1988). This executive agency is authorized to regulate the content of the documents and to investigate and prosecute violations of law based on the filings. 15 U.S.C. §§ 78m(d), 78u (1988); *see United States v. Fields,* 592 F.2d 638, 649 (2d Cir.1978) (filing prospectus which concealed material facts with SEC stated a claim under § 1001), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *United States v. Kuna,* 760 F.2d 813, 820 (7th Cir.1985) (sustaining conviction under § 1001 for false statement on broker-dealer registration); *United States v. Di Fonzo,* 603 F.2d 1260, 1263–64 (7th Cir.1979) (documents submitted to SEC in course of investigation within its jurisdiction), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62

L.Ed.2d 648 (1980); *see also United States v. Hansen,* 772 F.2d 940, 943–44 (D.C.Cir. 1985) (the term "jurisdiction" in § 1001 embraces the authority to conduct an official inquiry), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986); *United States v. Diaz,* 690 F.2d 1352, 1357 (11th Cir.1982) (grant of authority rather than its exercise determines jurisdiction).

Although the SEC may not act on every Schedule 13D, the filing of a false statement may interfere with its investigatory and enforcement function, including its determination whether or not to investigate a transaction. The securities laws are designed to make accurate information available to the investing public; the SEC's authority to regulate disclosure required under those laws brings the securities filings at issue within its jurisdiction for purposes of § 1001.

 Further, defendant makes a venue objection, stating the alleged violation occurred in Washington D.C., where the document was filed, and that the drafting of the document was mere preparation for the offense, not part of it. *See United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1190 (2d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). We disagree. The documents were prepared and signed—i.e. "made"—within the Southern District of New York, and thus venue was properly laid there. *See United States v. Mendel,* 746 F.2d 155, 165 (2d Cir.1984) (venue under § 1001 lies either where documents were prepared or filed), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985).

### C. *Conspiracy*

 Bilzerian was convicted on two conspiracy counts alleging that he participated in two multi-object conspiracies intended to defraud the United States and to commit specific offenses. The first conspiracy involved an agreement to park Robertson & Armco stock to generate tax losses without complying with disclosure required by § 13(d); the second was a scheme to accumulate Cluett and Hammermill shares, also without providing disclo-

sure under § 13(d). These agreements were found to violate the federal conspiracy statute, 18 U.S.C. § 371 (1988), which provides in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

 Section 371 prohibits two distinct types of conspiracies; conspiracies to defraud the United States and conspiracies to commit an offense against the United States. While the offense clause governs a conspiracy to commit a specific offense, defined elsewhere in the federal criminal code, the defraud clause is broader and covers agreements to interfere with or to obstruct government's lawful functions. *See United States v. Nersesian,* 824 F.2d 1294, 1313 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).

Bilzerian would have us rule that when conduct is chargeable under the specific offense clause, the government is precluded from prosecuting under the defraud clause. *See United States v. Minarik,* 875 F.2d 1186, 1193–94 (6th Cir.1989). Thus, he posits that the charges of conspiracy to defraud failed to state an offense because the conduct complained of is covered by specific statutes, that is, 15 U.S.C. §§ 78m(d), 78ff. This proposition is not persuasive. In *Minarik,* prosecution solely under the defraud clause—despite the existence of a specific statutory offense governing the conduct—led to substantial confusion and prejudiced the defendant's ability to prepare for trial. *Id.* at 1189–90. In any case, defendant's reading of *Minarik* is contrary to established law.

 Although it is recognized that the government may not obtain two convictions or punish the defendant twice for the same conduct by alleging violations of both the defraud and offense clauses of the conspiracy statute, *see, e.g., May v. United States,* 175 F.2d 994, 1002 (D.C.Cir.), *cert. denied,*

338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949), it may simultaneously prosecute the same conduct under both clauses. *See Nersesian,* 824 F.2d at 1313; *United States v. Williams,* 705 F.2d 603, 623–24 (2d Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

The schemes alleged in the instant case involved violations of numerous statutes, including § 13(d) and § 1001, and the requirements that broker-dealers make and keep accurate records, 17 C.F.R. §§ 240.-17a–3, 240.17a–4. Additionally, the indictment charged broader conspiracies involving stock accumulation and stock parking, which are activities not specifically prohibited by statute. Consequently, there is no prosecutorial impropriety in charging defendant under both prongs of § 371.

■■ Defendant further argues that the conspiracy to defraud charges fail to state an offense because the mere failure to comply with a regulatory requirement to provide information did not amount to active interference with a governmental function. *See Tanner v. United States,* 483 U.S. 107, 130, 107 S.Ct. 2739, 2752, 97 L.Ed.2d 90 (1987) (United States or an agency thereof must be the target of the conspiracy). As noted, the SEC is charged with administering and enforcing securities laws, and in order to perform its function must receive accurate and truthful disclosure. The function of the IRS in determining the legitimacy of a return similarly may be impaired by schemes generating tax losses and by false claims for deductions. Hence, the defraud conspiracy charges state an offense.

■■ Finally, Bilzerian urges there was insufficient proof of an agreement to commit specific offenses. A conspiracy conviction based on a multi-object conspiracy may be upheld so long as evidence is sufficient with respect to at least one of the criminal objectives. *United States v. Papadakis,* 510 F.2d 287, 297 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104

(1975). Viewing the evidence in the light most favorable to the government, *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we believe a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789.

The evidence at trial suggested that defendant planned to acquire large blocks of stock while delaying the reporting requirements in contravention of the securities laws, and that numerous records were generated to make it appear that Jeffries and Company had acquired stock at its own risk. False records also were generated to substantiate tax deductions that Bilzerian claimed on his 1985 tax return. As to each of the conspiracies charged there is adequate evidence from which a rational juror could have concluded that a conspiracy existed to achieve at least one criminal objective, that is to say, either to violate § 13(d) or to defraud the SEC and the IRS.

## CONCLUSION

Accordingly, the judgment of conviction is affirmed in all respects.

LUMBARD, Circuit Judge (concurring):

I concur in the affirmance of the judgment of conviction, substantially for the reasons set forth in Judge Cardamone's opinion.

Bilzerian was not denied a fair trial because the district court precluded him from denying criminal intent without waiving the attorney-client privilege. The court had ruled preliminarily that if Bilzerian testified regarding his good faith belief in the legality of certain conduct [1] he would subject himself to cross-examination as to the basis of that claim, including questions regarding communications that otherwise would be protected by the attorney-client privilege. As a result, Bilzerian took the stand but chose not to assert his good faith belief.

---

1. Bilzerian sought to testify that he acted in good faith in making certain statements in documents filed with the SEC, and in changing the structure of certain financing arrangements. In cross-examination regarding alleged prior inconsistent testimony before the SEC, Bilzerian similarly sought to assert that he believed his conduct was legal.

Because Bilzerian decided not to testify on these matters, his claims are not properly preserved for appeal. *See United States v. Ortiz*, 857 F.2d 900, 906 (2d Cir. 1988), *cert. denied*, 489 U.S. 1070, 109 S.Ct. 1352, 103 L.Ed.2d 820 (1989). Nevertheless, there was no error in Judge Ward's rulings. If Bilzerian had asserted good faith on direct examination, he could not use the attorney-client privilege to avoid cross-examination regarding the basis of that claim. *See United States v. Miller*, 600 F.2d 498, 501 (5th Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 434, 62 L.Ed.2d 327 (1979).

Bilzerian's contention that the district court erroneously admitted testimony by the government's expert while it excluded similar expert testimony by the defense has no merit. At trial, Judge Ward allowed the government witness, Professor John C. Coffee, to provide background information regarding the securities laws and the filing requirements of Schedule 13D. The district court permitted Bilzerian's expert, Lee B. Spencer, Jr., to do the same, but prohibited him from opining on the propriety of describing unsecured loans as "personal funds," in a Schedule 13D.

Much of Professor Coffee's testimony, which Bilzerian now contends was improperly admitted, was not objected to at trial. As a consequence, it cannot now be assigned as error. *See* Fed.R.Evid. 103(a)(1); *United States v. Heinemann*, 801 F.2d 86, 96 (2d Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). In any event, Coffee's testimony was proper factual background information, rather than legal conclusions. *See United States v. Scop*, 846 F.2d 135 (2d Cir.), *modified on rehearing*, 856 F.2d 5 (1988); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). Moreover, Judge Ward subsequently instructed the jury as to the limited purpose of the testimony.

There was no error in excluding Spencer's testimony regarding the meaning of the phrase "personal funds" in a Schedule 13D, as it was an impermissible instruction on governing law.

Third, Bilzerian's contention that the district court erred in admitting evidence of an error in Bilzerian's 1986 personal tax return is not persuasive. Brian Murphy, an accountant who prepared tax returns for a partnership in which Bilzerian participated, testified that Bilzerian told him that part of Bilzerian's capital contribution was personal funds. On cross-examination, Bilzerian sought to establish that the source of the funds had no effect on the partnership tax return. Bilzerian also elicited testimony regarding the accuracy of the partnership tax return. On redirect, over defense objection, the government inquired into the accuracy of Bilzerian's personal tax return, and elicited testimony that Bilzerian had understated his income by $4 million. Judge Ward denied Bilzerian's motion for a mistrial. He found that Bilzerian's cross-examination had created the impression that Bilzerian accurately reported the income on all tax returns, and this had opened the door to the government's redirect. Judge Ward acted within his discretion in admitting this evidence on redirect, to rebut the possible misimpression, arising from cross-examination, that Bilzerian accurately reported on all of his 1986 tax returns. *See United States v. Mang Sun Wong*, 884 F.2d 1537, 1544 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1140, 107 L.Ed.2d 1045 (1990).

Bilzerian next argues that it was improper for the government to prosecute him under the federal false statements statute, 18 U.S.C. § 1001 (1988) ("Section 1001"), for alleged mistatements and omissions in informational reports required by the Securities Exchange Act of 1934 because the government could prosecute him under Section 32(a) of the Exchange Act, 15 U.S.C. § 78ff (1988) ("Section 32(a)").

It is well-settled that when two statutory provisions overlap, the government may decide under which section to proceed, unless it is clear that Congress intended one section to preempt the other. Congress has not expressed any such intent regarding these provisions.

Fifth, Bilzerian asserts that even if his conduct constituted offenses under Section 1001, constitutional venue was proper only in Washington, D.C., where the reports containing the alleged misstatements and omissions were filed with the SEC. Venue in the Southern District of New York was proper, as this was where the documents were prepared and signed. *See United States v. Mendel*, 746 F.2d 155, 165 (2d Cir.1984), *cert. denied*, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985).

Sixth, there is no merit to Bilzerian's claim that the government failed to prove an offense under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (1988) ("Section 10(b)") or Rule 10b–5, which prohibit fraudulent practices in connection with the purchase or sale of a security, because it failed to prove a "fraud" within the meaning of the provisions. He contends there was no fraud because his misstatements and omissions were not material, and that no rational jury could have found materiality. The determination of materiality generally is a jury issue. In accordance with the teachings of *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988), the district court instructed the jury that a material fact "is one that would have been significant to a reasonable investor's investment decision." The jury's verdict was supported by ample evidence.

Finally, Bilzerian argues that his convictions for conspiracy in violation of 18 U.S.C. § 371 (1988) should be reversed because the same conduct cannot constitute both a conspiracy to defraud the United States and a conspiracy to commit substantive offenses. We rejected this argument in *United States v. Nersesian*, 824 F.2d 1294, 1313 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987) and in *United States v. Williams*, 705 F.2d 603, 623–24 (2d Cir.), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). There was ample evidence to support Bilzerian's convictions on both conspiracy counts.

WINTER, Circuit Judge, concurring in part and dissenting in part:

I concur in Judge Cardamone's disposition of the attorney-client privilege issue.

I also concur in the affirmance of the convictions based on violations of the securities laws. Although he is an estimable scholar, I believe that much of Professor Coffee's testimony was inadmissible. These portions consisted largely of legal opinions that should have been explored solely in the court's instructions to the jury. Moreover, the defense expert, Lee B. Spencer, a former Director of the SEC's Division of Corporate Finance, was prevented by the court from answering questions that were in principle indistinguishable from those answered by Professor Coffee. Nevertheless, Professor Coffee's testimony did not deviate in substance from the instructions given by the court to the jury and did not contain any matter that might otherwise prejudice the jury. I believe, therefore, that whatever error occurred was harmless.

With regard to the redirect examination of Murphy regarding Bilzerian's personal tax return, I believe that the redirect examination was improper. The cross-examination of Murphy by Bilzerian's counsel concerned the partnership returns only and merely established that the source of Bilzerian's funds was irrelevant to the partnership tax returns. In no way did this cross-examination open the door for questions regarding Bilzerian's personal tax return, and the question was improper. Reluctantly, however, I have concluded that this error was also harmless. When Bilzerian took the stand, he was cross-examined about his personal tax returns and was able to provide an exculpatory explanation of pertinent events that blunted the impact of the redirect examination of Murphy.

I respectfully dissent from the conviction under 18 U.S.C. § 1001. I, of course, do not disagree with the general canon relied upon by my colleagues that criminal statutes may overlap and that, when they do, the government may choose to indict under one rather than another. I cannot agree,

however, that, because criminal statutes *may* overlap, Section 1001 *must* overlap with Section 32(a) of the 1934 Act. The bottom line is Congressional intent. Another canon of construction thus dictates that courts must insure that every part of a statute be given meaning and not be rendered superfluous. *See United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955). Because we have construed Section 101's prohibition on false statements as not requiring a finding of materiality, Section 32(a)'s prohibition on "false [statements] ... with respect to any material fact" is superfluous. My colleagues' interpretation seems particularly questionable because the two provisions were the product of virtually simultaneous Congressional consideration and action and, at the time of passage, Section 1001 contained more stringent penalties. It certainly seems somewhat odd to me that Congress would pass Section 32(a), which specifically applies to filings required by the federal securities laws, and less than twelve days later render portions of it superfluous by passing a very general statute that required a lesser standard of proof and provided harsher penalties. With the exception of *United States v. Fields*, 592 F.2d 638 (2d Cir.1978), the cases relied upon by my colleagues are from other circuits and involved false statements in ongoing investigations. *Fields*, moreover, does not stand for the proposition for which it is cited, because it deals only with the issue of materiality.

I therefore concur in part and dissent in part.