Talos Capital Designated Activity Co. v 257 Church Holdings LLC (2023 NY Slip Op 50083(U))

[*1]

Talos Capital Designated Activity Co. v 257 Church Holdings LLC

2023 NY Slip Op 50083(U)

Decided on February 7, 2023

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 7, 2023
Supreme Court, New York County

Talos Capital Designated Activity Company, Plaintiff,

against
257 Church Holdings LLC, BA 616 COLLINS MEMBER LLC, LEEDS CAPITAL LLC, BEN ASHKENAZY, Defendant.

Index No. 651458/2020

Plaintiffs by:
Meister Seelig & Fein PLLC, 125 Park Ave, 7th Floor, New York, NY 10017
Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004; 801 17th St NW, Washington, DC 20006
Defendants by:
Friedman Kaplan Seiler Adelman & Robbins LLP, 7 Times Square, New York, NY 10036
Nixon Peabody LLP, 55 West 46th Street, New York, NY 10036

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 011) 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 263, 264, 265, 266, 267, 268, 269, 270, 271, 272, 273, 274, 275, 276, 277, 280 were read on this motion to/for RENEW/REARGUE/RESETTLE/RECONSIDER .
Upon the foregoing documents, Ben Ashkenazy's motion for reargument and renewal of this Court's Prior Decision (hereinafter defined) is denied because he fails to adduce any facts or law that this Court overlooked or misapprehended and does not otherwise provide a reasonable justification for the failure to present the Now Alleged Oral Agreement (hereinafter defined) or any other facts in opposition to the prior motion relating to (i) whether certain documents in the [*2]case are privileged and (ii) the Court granting leave to Plaintiff to make certain motions [FN1]
(CPLR 2221[d]; Jones v City of New York, 146 AD3d 690, 690-691 [1st Dept 2017]; CPLR 2221[e]).
With respect to Mr. Ashkenazy's claim that certain documents are subject to attorney-client privilege, the Court did not hold that Mr. Ashkenazy had waived the attorney-client privilege because the Appellate Division found the underlying contracts to be ambiguous. This is a mischaracterization of what the parties argued and what this Court held.
The Plaintiff moved (Mtn. Seq. No. 5) to compel arguing that Mr. Ashkenazy had put his attorney's advice as to the timing of when Mr. Ashkenazy's obligation is due under the Guaranty of Recourse Payment Obligations (Mezzanine Loan) (the Payment Recourse Guaranty) "at issue" and requested an in camera review of relevant documents as to which Mr. Ashkenazy claimed privilege (citing, inter alia, Deutsche Bank Tr. Co. of Americas v Tri-Links Inv. Tr., 43 AD3d 56, 63 [1st Dept 2007]; Bowne of NY City, Inc. v AmBase Corp., 150 FRD 465, 488 [SD NY 1993]; Cicel (Beijing) Sci. & Tech. Co. v Misonix, Inc., 331 FRD 218, 228 [ED NY 2019]). The Plaintiff also argued that a party may implicitly waive the privilege when it asserts "a claim that in fairness requires examination of protected communications" (U.S. v. Bilzerian, 926 F2d 1285, 1292 [2d Cir 1991]). Given that the parties had sophisticated counsel negotiate the Payment Recourse Guaranty, the Plaintiff argued that Mr. Ashkenazy had placed his lawyers' communications with him about that guaranty and the timing of his obligations under the Payment Recourse Guaranty "at issue" (NYSCEF Doc. No. 94, at 9-10).
In his opposition papers and in support of their own motion to compel (Mtn. Seq. No. 6), Mr. Ashkenazy argued that "the question of the timing of his payment guaranty is best answered by the plain text of the Recourse Guaranty without need to consider the parties' subjective intent " (NYSCEF Doc. No. 106, at 5). Mr. Ashkenazy also argued that whether the Payment Recourse Guaranty is a "bad boy" guaranty is a red herring because that does not go to the timing of the obligation. Mr. Ashkenazy further argued that the relevant privilege cases cited by the Plaintiff were inapplicable and that the requests were overbroad. Mr. Ashkenazy, however, did acknowledge that applicable privileges could be waived under certain circumstances:
No case has found a privilege waiver by a party who merely argues, as Ashkenazy does, that the best guide to an agreement's interpretation to an agreement's meaning is the text itself. Indeed, as discussed in detail in Ashkenazy's parallel motion to compel, it is [*3]Plaintiff, not Ashkenazy, who has placed the parties' intent at issue. . . . The Motion contemplates the production of "all documents and communications [Ashkenazy] contends are privileged that relate to the terms of [the Recourse Guaranty]." That is at best a grossly overbroad demand. To the extent any privileged documents are to be produced for inspection, they should be limited to documents — if they exist — that relate to that timing issue. (Ashkenazy's opposition to Plaintiff's motion should not be taken to imply that there are such privileged documents, or that any that exist are significant.)
(id., at 2-3). Regarding the waiver of privilege, Mr. Ashkenazy acknowledged the issues of waiver, but argued:
It is well settled that the attorney-client privilege is waived when a party "place[s] the subject matter of counsel's advice in issue and by making selective disclosure of such advice." Orco Bank, N.V. v. Proteinas Del Pacifico, S.A., 179 AD2d 390, 390 (1st Dep't 1992) (citing cases). Direct testimony by a contract's drafting attorneys as to their intent and that of their client(s) is the very definition of placing something at issue. This is because attorney testimony about drafting intent reveals privileged information and thus waives the privilege as to drafting history generally.
New York law treats testimony about contract meaning and negotiation as privileged matters. See Jones v. Gelles, 167 AD2d 636, 639 (3d Dep't 1990) ("Because plaintiff chose to have her attorney testify about their negotiating intent, she impliedly waived the attorney- client privilege"). Scholars and lower courts applying New York law view attorney testimony as a waiver that precludes claims of privilege to shield documents addressing that subject matter. See 8 Wigmore, Evidence § 2327, at 637-38 (Rev. ed. 1961); 1 McCormick on Evidence § 93 (8th ed. 2020); Jakobleff v. Cerrato, Sweeney & Cohn, 97 AD2d 834, 835 (2d Dep't 1983) ("client ... who permits his attorney to testify regarding the matter ... is deemed to have impliedly waived the attorney-client privilege"); MBIA Ins. Corp. v. Patriarch Ptnrs. VIII, LLC, No. 09 Civ. 3255, 2012 WL 2568972, at *6 (S.D.NY July 3, 2012) ("it is well established that a party waives the attorney-client and work product privileges whenever it puts an attorney's opinion into issue, by calling the attorney as an expert witness or otherwise.") (quoting Herrick Co., Inc. v. Vetta Sports, Inc., No. 94 Civ. 905 (RPP), 1998 WL 637468, at *1 (S.D.NY Sept. 17, 1998)). (For this reason, attorney testimony rarely occurs.)
Thus, neither a party nor its lawyers may simultaneously testify as to intent and meaning of a contract and, under the cloak of privilege, withhold documents reflecting that intent and meaning. See, e.g., MBIA, 2012 WL 2568972, at *8 (finding waiver where party submitted affidavits of attorneys and confirmed that attorneys "will testify concerning their 'intent and interpretation of the contracts[,]" and enforcing waiver "against all documents that concern those subject matters").
As Plaintiff points out, even if a party does not attempt to use a privileged communication, it "may waive the privilege if [it] asserts a factual claim the truth of which can only be assessed by examination of a privileged communication." Bowne of NY City, Inc. v. AmBase Corp., 150 F.R.D. 465, 488 (S.D.NY 1993); U.S. v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir.1991); Cicel (Beijing) Sci. & Tech. Co. v. Misonix, Inc., 331 F.R.D. 218, 228 (E.D.NY 2019) (waiver may apply when a party avers "material [*4]facts at issue related to the privileged communication, and where the validity of those facts can only be accurately determined through an examination of the undisclosed communication")
(NYSCEF Doc. No. 102, at 7-8)[FN2]
.
To the extent that the Court granted the Plaintiff's motion, Mr. Ashkenazy asked that the documents be reviewed by a Special Master. In the Decision and Order dated October 3, 2022 (NYSCEF Doc. No. 109; the Prior Decision) granting both the Plaintiff's motion to compel andMr. Ashkenazy's motion to compel, this Court held that:
The sole issue in this case is the timing of when Mr. Ashkenazy's payment obligation is due. The Appellate Division decision places contractual meaning as to the timing of the payment at the heart of the case—and discovery—as to both parties is warranted. To the extent that each party's understanding of when payment was intended to be due then relies on communications with their respective counsel, these communications are not necessarily privileged for at least two reasons. First, the communications may relate to business issues and not legal advice. Second, to the extent either party is relying in their understanding on advice of counsel, then any privilege may have been waived. For clarity, to the extent Mr. Ashkenazy has argued that the obligation is due at maturity and that he has a different understanding of what the documents mean than that of the plaintiff, he has placed this is "at issue" and can not now claim privilege over communications with his attorney as to this issue. However, to the extent that the communications involve legal advice having nothing to do with the timing of the obligation, they are privileged and at issue waiver would not apply. This is why in camera review is needed. Both sets of communications must be produced to the Court by noon on Tuesday, October 4, 2022. Mr. Ashkenazy's request for a special master must be denied. It is wholly irrelevant that the Court may be the fact finder in this case. Judges as triers of fact resolve evidence issues that require them to see evidence that then may be excluded.
Following review of documents produced in camera, this Court concluded that the document bearing bates stamp 7474 by its express contents conveys only the business terms of the proposed transaction and is not legal advice. 
It is thus not subject to the attorney-client privilege.
The document bearing bates stamp 7456-57 includes Gregg Miller from Haynes Boone and Michael Alpert. These are third-parties whose presence on the communication could affect a waiver. Mr. Miller was not Mr. Ashkenazy's attorney in negotiating the Payment Recourse Guaranty. David Kriss of Kriss & Feurstein LLP was, and Mr. Ashkenazy, in opposition to the motion to compel, made no attempt to explain who Mr. Miller represented or what Mr. Alpert's role was in the transaction, or how their interests were aligned as to the timing of Mr. [*5]Ashkenazy's payment obligation. Thus, Mr. Ashkenazy has not established that Mr. Miller or Mr. Alpert are within the scope of his privilege. This is particularly true given that Mr. Ashkenazy's non-payment on his personal payment obligation did not cause an event of default under the mezzanine loan such that the mezzanine borrower would be affected.[FN3]
Nothing in Mr. Ashkenazy's motion seeking reargument attempts to adequately address this either. It also should be noted that Mr. Ashkenazy also never has adequately explained why the subject matter of any attorney-client privilege related to the timing of when his obligation to make payment under the Payment Guaranty was not waived as the Plaintiff had argued (Deutsche Bank Tr. Co. of Americas v Tri-Links Inv. Tr., 43 AD3d 56, 63 [1st Dept 2007]).
Mr. Ashkenazy is also not entitled to reargument and renewal of the Court's decision granting leave to the Plaintiff to bring a motion for summary judgment and sanctions for two reasons. First, the documents adduced in camera from both parties appear to support the Plaintiff's position [FN4]
, the explanation offered by Robert Sorin of Fried Frank (transaction counsel [*6]to Plaintiff) (NYSCEF Doc. No. 76)[FN5]
as to the ambiguity identified by the Appellate Division, [*7]and also suggest that Mr. Ashkenazy did not have a good faith basis to argue that that there is a difference in timing between when his obligation was triggered and when his obligation is payable — i.e., that his payment obligation is only due at maturity. Second, in response to the Court's order ordering both parties to produce for in camera review only documents for which the parties claimed privilege, Mr. Ashkenazy first offered to dump 700 documents on the Court. Then, after the Court granted Mr. Ashkenazy a number of extensions to review documents on which he had already claimed privilege, Mr. Ashkenazy delivered documents to the Court as to which no facial claim for privilege could exist, including because some documents included third-parties not within Mr. Ashkenazy's privilege (e.g., Tom Glathaar, counsel to the title company). Ultimately, as the Court has now stated in certain case management orders, it is for the Plaintiff to decide whether to bring a further motion and whether to seek sanctions. For completeness, the Plaintiff has been urging this Court to hold a single issue hearing to resolve the ambiguity identified by the Appellate Division [FN6]
since the Remittitur when they brought their motion seeking attachment which this Court denied (NYSCEF Doc. No. 81). 
That Mr. Ashkenazy would like to argue that the documents do not support the Plaintiff's position can be addressed in his opposition to the Plaintiff's motion for summary judgment or in support of his own cross-motion for summary judgment. As such, reconsideration is not required. It also does not matter that following this Court's Prior Decision, Mr. Ashkenazy has now alleged new facts 
that were always known to him.
To wit, Mr. Ashkenazy has now, approximately three years into this litigation testified about the Now Alleged Oral Agreement. The lender and its counsel do not remember having any conversations about this alleged oral agreement and counsel to the Plaintiff indicates that it is at odds with the documents and urges the Court to hold a credibility hearing.[FN7]
Mr. Ashkenazy[*8]also now claims that he never reviewed the loan documents and only made the business deal. In addition, Mr. Ashkenazy's transaction counsel now has testified that some of the correspondence that the Court reviewed pre-date the lender's requirement for a Payment Recourse Guaranty (ignoring that these emails and the business rationale for the requirement of a Payment Recourse Guaranty are relevant to the timing of when Mr. Ashkenazy's payment obligation is due). What does matter is that after the deal was already consummated, including after the Payment Recourse Guaranty was executed, questions were still being asked as to the operation of the Payment Recourse Guaranty and the circumstances under which Mr. Ashkenazy would be liable for the $20 million payment. At bottom these are issues that are appropriately addressed at summary judgment, and in being so addressed will assist the Court in deciding whether issues exist for trial.
Putting aside that the lender may not remember any Now Alleged Oral Agreement, and dispute whether any Now Alleged Oral Agreement occurred, and that the suggestion of any Now Alleged Oral Agreement is irreconcilable with the contemporaneous communications between the parties (as counsel to the Plaintiff has indicated), all of this new material offered by Mr. Ashkenazy can be addressed in the summary judgment briefing and certainly does not moot it.
With regard to discovery, it also was simply false for counsel to Mr. Ashkenazy to represent to the Court in writing that no documents squarely addressing or relevant to when Mr. Ashkenazy's payment obligation is due had been located [FN8]
. This representation appears to have been an inappropriate attempt to limit discovery and was based on the fact that Mr. Ashkenazy and his attorneys were unable to locate documents or correspondence stating that his payment obligation is not due at maturity (as he contends) or that otherwise discusses a difference in timing between when his obligation was triggered and when he contends it is payable. This was not a valid basis for limiting discovery. 
Documents are significant not only for what they do say but also for what they do not. The fact that there were documents discussing when Mr. Ashkenazy's obligation is triggered and do not discuss any difference in timing between when the obligation is triggered and when it is payable is directly relevant to the understanding of the timing issue of when Mr. Ashkenazy's obligation is payable. The Plaintiff is entitled to know that there are communications that do not discuss a difference in timing and use those materials in support of the Plaintiff's position. The Plaintiff is also entitled to know that there were non-privileged communications inquiring as to the operation of the Payment Recourse Guaranty after the Payment Recourse Guaranty was executed and that those non-privileged communications do not indicate that the Payment Recourse Guaranty is due at maturity.
Put another way, Mr. Ashkenazy's position that documents only are relevant if they specifically discuss a difference in the timing of when his obligation is triggered and when it is payable (if such documents exist) is based on a false premise. Relevant documents also include [*9]documents which pre-date the Payment Recourse Guaranty as they may explain why the parties negotiated a Payment Recourse Guaranty in the first place and why the obligation would be either due when triggered or due at maturity. Given that the Court had not (and has not) yet resolved the ambiguity identified by the Appellate Division, full discovery of documents which discuss the business deal, why there was a five year paydown obligation, why it did not cause an event of default under the mezzanine loan, why separate collateral was required, why a Payment Recourse Guaranty was required and how such obligations are intertwined and support the underlying business deal is required. Mr. Ashkenazy did not present authority to this Court to support such a narrow scope of discovery especially in the wake of the Appellate Division decision holding that the contracts at issue were ambiguous. 
Finally, with respect to briefing on summary judgment, it will be incumbent on Mr. Ashkenazy to address why, to the extent Mr. Ashkenazy relies on the Now Alleged Oral Agreement, this alleged agreement never was brought to the attention of the Court or the other parties— i.e., in opposition to the motion for summary judgment in lieu of complaint, in opposition to the motion for attachment, or in opposition to the motion to compel. Inasmuch as Mr. Ashkenazy alleges to have had this Now Alleged Oral Agreement (which seemingly is at odds with the November 2013 Martin Frass-Ehrfeld email), this is not a fact learned during discovery and was not unknown when the prior motion, challenged here, was in front of this Court. Thus, the motion for reargument and renewal must be denied in its entirety.
The Court has considered Mr. Ashkenazy's remaining arguments and finds them unavailing.
DATE 2/7/2023
ANDREW BORROK, J.S.C.

Footnotes

Footnote 1: In the almost three years that this lawsuit has been pending, the parties have litigated this case based on the premise that no direct conversation between the parties took place as to when Mr. Ashkenazy's non-recourse carveout payment obligation is due. In opposition to the Plaintiff's motion for summary judgment in lieu of complaint, Mr. Ashkenazy made no mention of the Now Alleged Oral Agreement. In their motion to reargue the summary judgment in lieu of complaint (which was withdrawn), the Defendants again made no mention of the Now Alleged Oral Agreement and instead only argued that charging both contractual and statutory interest was improper. Following Remittitur from the Appellate Division finding the contracts to be ambiguous, Mr. Ashkenazy again made no mention of the Now Alleged Oral Agreement in opposition to the Plaintiff's motion for an attachment. And finally, in opposition to the motion to compel, Mr. Ashkenazy again made no mention of the Now Alleged Oral Agreement. Now, in his deposition, Mr. Ashkenazy indicates that he both never reviewed the documents at issue in this case and also that he had a conversation with the principal for the lender in which they agreed that his payment obligation was due at maturity (the Now Alleged Oral Agreement). In addition, notwithstanding that Robert Smith, his lawyer, argued in opposition to the motion for attachment that there was no dispute that Mr. Ashkenazy's obligation was triggered, Mr. Ashkenazy now also has testified that he disputes that his obligation was triggered (compare NYSCEF Doc. No. 79 and NYSCEF Doc. No. 171, at 17).

Footnote 2: Based on the foregoing, Mr. Ashkenazy argued that by submitting Mr. Sorin's affirmation in support of its motion for attachment, the Plaintiff had put its attorney-client communications at issue. For completeness, in Mr. Ashkenazy's motion to compel, Mr. Ashkenazy sought documents related to the Plaintiff's standing. As discussed in the Prior Decision, inasmuch as standing was waived as a defense, the Court denied this portion of Mr. Ashkenazy's motion (see Talos Capital Designated Activity Co. v 257 Church Holdings LLC, 205 AD3d 509, 509 [1st Dept 2022]).

Footnote 3:It appears that Mr. Miller may have represented the borrower. Interestingly, as to any claim of privilege, Mr. Ashkenazy now testifies that he "had no idea" who Mr. Miller was (NYSCEF Doc. No. 171, at 90 and 100). It appears that Mr. Alpert also is not an employee or agent of Mr. Ashkenazy; rather as Mr. Ashkenazy testified "Michael Alpert is a partner of the deal, not a worker. He didn't work for me" (NYSCEF Doc. No. 171, at 67). In fact, Mr. Alpert signed the Guaranty of Payment (Mezzanine) (NYSCEF Doc. No. 6) only on behalf of Leeds Capital LLC which guaranty was separately executed by Mr. Ashkenazy on behalf of two other entities, BA 616 Collins Member LLC and 257 Church Holdings LLC — i.e., the pledge required by the lender as additional collateral was made up of both Leeds entities and Ashkenazy entities. But again, as the party asserting privilege, once challenged, it was for Mr. Ashkenazy to account for all those on allegedly privileged communications (as well as any other bases of privilege) and to show why any alleged privilege was not waived by Mr. Alpert or Mr. Miller being included on communications regarding Mr. Ashkenazy's individual legal interests and personal obligation. This he has failed to do.

Indeed, when the Court gave Mr. Smith the opportunity to respond to the third parties' documents at the October 12, 2022 conferencewhere Mr. Smith requested that following the Prior Decision, the Court issue a Supplemental Order ordering the production of the documents—Mr. Smith stated:

Yes. On Question of the third-party documents, You Honor has, absolutely, correctly stated it went to a third party. It's not privileged.

What I understand to be the fact is the reverse situation. Documents — non-privileged communications to third party, which then become party of an attorney-client communication, is also for the purpose of legal advice. I would add, your Honor, that as I understand the law, if the documents are for the purpose of obtaining legal advice, you can't — you're quite right — and, I agree — that you can't confer privilege on an otherwise unprivileged document just by sending it to a lawyer.
(NYSCEF Doc. No. 149, at 8-9, lines 22-25, 1-12). This is not however what is reflected in document bearing bates stamp 7456-57. All communications in the email chain with Mr. Kriss included both Mr. Alpert and Mr. Miller; hence the issue of their roles and their effect on the privilege remains. 

Footnote 4: The Plaintiff's documents include an email, dated November 14, 2013, from Martin Frass-Ehrfeld (the person with whom Mr. Ashkenazy has now testified he had the Now Alleged Oral Agreement) to Richard Kelly, cc;ing Avi Feinberg and Robert Sorin, bearing bates stamp 001) suggest that if the five year paydown did not occur, the lender could claim against the collateral and Mr. Ashkenazy personally immediately:
"If they don't pay down 10 mio by year 5, we are allowed to clim 20 mio against collateral AND a 20 mio personal guarantee from ben Ashkenazy"
Not a single document produced by the parties for in camera review support the idea that Mr. Ashkenazy's obligation is never due unless a refinancing occurs and not until maturity. 

Footnote 5: 1. I am a partner of the firm Fried, Frank Harris, Shriver & Jacobson LLP with more than 30 years of experience as an attorney handling commercial real estate transactions.

2. I acted as transactional counsel to Plaintiff Talas Capital Designated Activity Company (f/k/a Talas Capital Limited) in drafting and negotiating the interrelated mezzanine loan documents and guaranty agreements memorializing the $195 million mezzanine loan made on November 25, 2013, which are the subject of this action, and I am fully familiar with the contents thereof.

3. I understand that the Guaranty of Recourse Payment Obligations (Mezzanine Loan), (the "Payment Recourse Guaranty"), executed by Ben Ashkenazy ("Ashkenazy") was the subject of an appeal taken from the Court's January 26, 2021 judgment in favor of Plaintiff and against Ashkenazy, and that on May 12, 2022, the Appellate Division vacated so much of the judgment as is against Ashkenazy, finding an ambiguity as to whether Ashkenazy's obligation to pay arose at the time of the Paydown Default, as that term is defined in the Mezzanine Loan Agreement, or upon the maturity of the mezzanine loan.

4. The Payment Recourse Guaranty is a type of guaranty known in the industry as a "bad boy" or "non-recourse carve-out" guaranty and is triggered by certain "bad boy" acts in which the individual who controls the relevant entities may cause the entities to engage. The individual guarantor who does so becomes immediately liable for the secured obligations or for the losses caused by the "bad boy" acts - a consequence that is supposed to serve as a disincentive for the individual to cause "bad boy" acts in the first place.

5. If called to give testimony at an evidentiary hearing, I would testify truthfully that the intent of the parties at the time the Payment Recourse Guaranty was negotiated and entered into was that Ashkenazy's obligation to pay arose immediately upon a Paydown Default if Ashkenazy caused a violation of either the Collins Pledge or Church Pledge by causing the refinancing of either of the underlying properties. That is the only interpretation of the Payment Recourse Guaranty that makes any sense in the context of the particular business deal the parties entered into. The parties knew and agreed that to have the requisite deterrent effect, the "bad boy" guaranty had to require the immediate imposition of liability upon the individual guarantor in the event he caused the entities he controls to engage in one of the enumerated "bad boy" acts, especially since, in the event of a "bad boy" act, the available collateral could be rendered insufficient to repay the amount owed.

6. In other words, the entire purpose of the "bad boy" guaranty would be defeated if Ashkenazy were permitted to engage in a "bad boy" act threatening the lender's security interest in the collateral with no consequence until after the maturity of the loan.

7. The idea that recourse to the "bad boy" guarantor is immediate was the intent behind the language of Section 1.1 (a) of the Payment Recourse Guaranty, which provides that he guarantees "the payment and performance of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise."

8. I understand that the Appellate Division found it significant that the Payment Recourse Guaranty is not mentioned in the Mezzanine Loan Agreement, unlike the Payment Guaranty by the entity guarantors, which is. But this fact only reflects the intent of the parties that the Payment Guaranty was automatically operative and available as a remedy in the event of any Five Year Paydown Default, whereas the Payment Recourse Guaranty was not automatic, and would only be triggered if there was both a Five Year Paydown Default and a "bad boy" act. Again, it was not the parties' intent to require the lender to exhaust all remedies against the entity guarantors under the Payment Guaranty in the event of a "bad boy" act, but to enable to lender to have immediate recourse to Ashkenazy individually.
(NYSCEF Doc. No. 76 [emphasis added]).
Footnote 6: "On remand, the Court can easily resolve the ambiguity with an evidentiary hearing. There are no material issues of fact concerning the underlying events; and no matter how cleverly Defendant's counsel argued its appellate issue, the ambiguity-issue is neither deep nor difficult" (NYSCEF Doc. No. 78, at 1-3).
Footnote 7: The Plaintiff argues that the testimony of Mr. Ashkenazy and Mr. Kriss is fundamentally at odds with the contemporaneous communications between the parties and in the non-privileged communication from Mr. Kriss (bates stamp 7456-57) which occurred after the Payment Recourse Guaranty was executed when he explained to Mr. Ashkenazy and a third party that Mr. Ashkenazy would never be liable under the Payment Recourse Guaranty unless he refinanced but did not mention in that communication that the obligation if triggered would only be due at maturity. The fact that this communication occurred after the Payment Recourse Guaranty was executed and that Mr. Ashkenazy was inquiring about how it worked is notable because it belies the notion that Mr. Ashkenazy did not rely on advice from counsel as to how the Payment Recourse Guaranty worked. The Plaintiff further argues that the response from Mr. Kriss highlights that the testimony is false because a sophisticated lawyer like Mr. Kriss would have mentioned that the obligation was only due at maturity if in fact this was the case and the "business deal." Indeed, the Plaintiff argues that there is not a single communication on either side indicating a difference in timing between the triggering of Mr Ashkenazy's obligation and that it would be due at a different time. This, according to the Plaintiff, is entirely made up and Mr. Ashkenazy's testimony about a difference in timing amounts to perjury. Mr. Ashkenazy testified that the lender had agreed to have this obligation triggered at maturity because of a reset in the rents:

Q. So, let me just understand. The business deal was that the Lender could go after the collateral for the 20 million if the five-year paydown wasn't paid, correct?
 A. Correct. 
Q. But if you did something to impair their ability to go after that collateral triggering your guarantee, they would have to wait another five years to collect against you? 
 A. Precisely. 
Q. Does that make sense, Mr. Ashkenazy? 
A. Not only does it make sense, it's what's like makes sense on steroids. Is there a word for that in the English vocabulary? 
 Q. No. 

 A. Well, then, let me explain it to you. Q. Okay. 
A. Ben Ashkenazy  the business deal with Martin was never — was to never have to come out-of-pocket even in the event — in the event that I triggered my recourse until maturity of the loan. Because it was tied to the reset of the rent, and the reset of the rent was going to improve the — much improve the income. Was — the income was supposed to, at reset, be a multiple of many multiples of the current rent. And a year later, assuming I defaulted, and assuming I created recourse for myself for $20 million, which was also capped at $20 million, only at maturity, and only after that nine and a half years came due, and if the one wasn't paid in full, I would owe $20 million, not a penny more.
(NYSCEF Doc. No. 171, at 49-51, lines 24-25, 18-25 and 1-9). The Plaintiff's position appears to be that if the lender were to tie an obligation to increase equity / decrease the debt to equity ratio after five years (which Mr. Ashkenazy acknowledged in his deposition and the parties do not dispute [id., at 35, lines 12-17]), based on the rent resets then the paydown date itself would have been tied to the rent resets — i.e., there would not have been a five year paydown date, the obligation itself would have been due at maturity. This is not what the parties agreed and this is inconsistent with what the Appellate Division identified as ambiguous. It is undisputed that the paydown obligation was a five year obligation and that it was tied to that date. Mr. Ashkenazy also fails to explain why there would need to be a personal obligation at all if it was due at maturity because at maturity the whole loan is either getting paid off or refinanced and the need to increase equity / decrease the debt to equity ratio would seem to be moot. In other words, in sum and substance, and as Mr. Sorin previously explained under Mr. Ashkenazy's theory there would be no point to the Payment Recourse Guaranty at all. As discussed above, this all need not be addressed here by the Court as it is not relevant to this motion and can be addressed in the summary judgment motion and the joint-statement of facts that the Court indicated was appropriate.
Footnote 8: See Affirmation of Nora Bojar (NYSCEF Doc. No.107, ¶ 6) ["such privileged communications likely did not exist based on a current review of documents"]); Email, dated October 3, 2022, of Alexander Levi ("Mr. Ashkenazy is aware of no contemporaneous e- mail or other document squarely addressing the "timing" issue").